Brenda BRIGHT–JACOBS, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. CIV.A.3:03–CV–029–JMF.

United States District Court,
N.D. Georgia,
Newnan Division.

April 15, 2004.

Order Modifying Opinion on Denial of
Reconsideration Oct. 5, 2004.

Charles Lee Martin, Office of Charles L. Martin, Decatur, GA, for Plaintiff.

Alonzo H. Long, Office of United States Attorney, Atlanta, GA, for Defendant.

*MAGISTRATE JUDGE'S*
*FINAL ORDER*

FELDMAN, United States Magistrate Judge.

This is an action to review the determination by the Commissioner of Social Security ("the Commissioner") that Brenda Bright–Jacobs is not entitled to a period of disability, disability insurance benefits (DIB) and/or supplemental security income (SSI) under §§ 216(i), 223(a), and 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. §§ 416(i), 423(a), and 1382.

*PART ONE HISTORY OF THE CASE*

On December 29, 1993, claimant filed an application for disability benefits, alleging she had been disabled since January 15, 1993, apparently due to back surgery and nerve damage and pain. Tr. 46, 117, 121–126, 139, 149, 481. The claim was denied initially on March 26, 1994, and on reconsideration on July 28, 1994. Tr. 129–30, 137–38. On November 6, 1995, a *de novo* hearing was held before Administrative Law Judge (ALJ) Robert L. O'Steen, who received testimony from the claimant and Vocational Expert (VE) Vivian Hanna. (Tr. 59–116).

In addition to the foregoing, on January 3, 1994, the claimant also filed an application for supplemental security income benefits (SSI), alleging that she had been disabled since January 15, 1993, due to back problems, hiatal hernia. Tr. 139–142, 149. The SSI application was denied initially on March 26, 1994, and on reconsideration, on July 28, 1994. Tr. 143–44, 146–47, 149–51. After the foregoing November 6, 1995 *de novo* hearing (Tr. 59–116), ALJ O'Steen determined in his June 28, 1996 opinion that since the claimant was able to perform her past jobs, she was not disabled, and not eligible for wage earner's or SSI benefits. Tr. 46–54. The claimant's request for review by the Appeals Council was denied on September 12, 1997. Tr. 3–4. A timely appeal to this Court followed.

The case was docketed as *Bright v. Apfel,* Civil Action No. 1:97–CV–3509–JEC (NDGa.). On February 24, 1999, Magistrate Judge Gerrilyn G. Brill issued a Report and Recommendation that the Commissioner's decision be affirmed (Tr. 660–678), which Report and Recommendation was, on April 9, 1999, adopted as the District Court's Order. Tr. 642.

On April 4, 2000, the Eleventh Circuit Court of Appeals reversed the District

Court's decision of April 9, 1999, and remanded the case to the Commissioner for further proceedings. Specifically, that Court found that the ALJ denied the claimant a full and fair hearing: (1) by failing to consider all of the claimant's impairments, and (2) by failing to specify the weight he attached to the various medical reports. Tr. 630–38, 679–83. *See Bright v. Apfel*, 212 F.3d 600, 2000 WL 432431 (11th Cir.2000) (per curium) (not published). Thereafter, the District Court remanded the case to the Commissioner for further proceedings. Tr. 627–629.

On November 18, 2000, the Appeals Council remanded the case to an ALJ for further proceedings. Tr. 636–638.

In the meantime, on October 31, 1997, the claimant filed a second application for SSI benefits, alleging that she was disabled by virtue of disorders of her back—discogenic degenerative, and an affective disorder since April 2, 1994. Tr. 641, 703–06. The application was denied initially on January 28, 1998, and on reconsideration on March 17, 1998. Tr. 641, 646–47, 652–53. As shown hereafter, *de novo* hearings were held before ALJ James E. Deen, Jr. on January 25, 1999 (Tr. 531–584) and May 14, 2001 (Tr. 535–626) to consider the new application and the remand, and ALJ Deen issued a 49–page partially favorable decision finding that the claimant was disabled and entitled to SSI benefits from September 1, 1997 through October 31, 1999, but not before or after, as she was not disabled before September 1, 1997, and her disability had ceased as of November 1, 1999. Tr. 477–529. In due course, the claimant exhausted her administrative remedies and again appealed the decision to this Court.

*See Bright–Jacobs v. Barnhart*, Civil Action No. 3:03–CV–02 (NDGa.).

As previously noted, the Eleventh Circuit and the District Court remanded the case to the Commissioner, who remanded it to a new ALJ, James E. Deen, Jr. On January 25, 1999, the new ALJ, James E. Deen, held his first hearing on the new application and the remanded decision, and received testimony from the claimant and a new VE, Dr. Phillip Wierson, PhD. Tr. 531–584. He held a second hearing on May 14, 2001, and again heard testimony from the claimant and a third VE, Alice Gardner. Tr. 585–626. Although the claimant's husband was present as an observer at Deen's second hearing, he was not called to testify. Tr. 585.

On October 11, 2002, the ALJ issued his 49–page partially favorable decision, finding that the claimant was disabled from September 1, 1997 until October 31, 1999, but not thereafter. Tr. 477–529.

In due course, the claimant appealed that decision to the Appeals Council, which apparently declined further review.[1] Tr. _____. The claimant then appealed the new partially favorable decision to this Court. [Doc. 1].

*PART TWO THE ISSUES*

1. Whether the Commissioner's decision that the claimant can perform his/her past relevant work is supported by substantial evidence;

2. Whether the ALJ denied the claimant a full and fair hearing—

 a. whether the ALJ properly determined that the claimant was not enti-

---

1. The index to the two-volume record fails to include a notation for the Appeals Council's action; and neither party's brief gives a tran-

script number or the date of the Appeals Council's action.

tled to benefits before September 1, 1997 because her disability was caused in part by alcoholism; and

b. whether the ALJ properly determined that the claimant's disability ended on October 31, 1999.

*PART THREE THE STANDARD FOR REVIEW*

▪▪▪ The claimant bears the initial burden of proving that he is disabled, which burden is met when he proves that he suffers from a severe impairment that renders him unable to pursue his customary employment. Thereafter, the burden shifts to the Commissioner to prove that the claimant can, nevertheless, perform other types of substantial gainful activity. *Freeman v. Schweiker*, 681 F.2d 727 (11th Cir.1982). In determining whether a claimant is disabled within the meaning of the Social Security Act, the Commissioner is required to consider:

(1) Objective medical facts or clinical findings;

(2) Diagnosis of examining physicians;

(3) Subjective evidence of pain and disability as testified to by the claimant and corroborated by his wife of other members of his family, his neighbors and others who have observed him; and

(4) The claimant's age, education and work history . . . .

*DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir.1972); *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir.1983).

The Commissioner, in reaching his determination, must also follow a sequential evaluation. 20 C.F.R. §§ 404.1520, 416.920 (1986). A claimant presently engaged in substantial gainful activity is declared not disabled and the inquiry ceases. 20 C.F.R. §§ 404.1520(b), 416.920(b) (1986). If the claimant is not engaged in substantial gainful activity, the Commissioner must determine whether he suffers from a severe mental or physical impairment. If the impairment is non-severe, claimant is declared not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c) (1986). If his impairment is severe, it meets the durational requirements, and it equals or exceeds a "listed" impairment, the claimant is considered disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d) (1986). If the severe impairment does not equal or exceed a listed impairment, the Commissioner must then determine the claimant's residual functional capacity (i.e. the degree to which a claimant can function, despite his physical or mental impairment(s)). The Commissioner must then evaluate the physical and mental demands of the claimant's past relevant work, and whether the claimant can meet those demands. If so, there must be a finding of no disability. 20 C.F.R. §§ 404.1520(e), 416.920(e) (1986); *Perez v. Schweiker*, 653 F.2d 997 (5th Cir. 1981). If the claimant cannot perform his past relevant work, then the Commissioner must decide whether the claimant's impairment(s) prevent him from doing any other substantial gainful activity (SGA). 20 C.F.R. §§ 404.1520(g) and 416.920(f). In the event the impairment(s) preclude other SGA, a finding of disability is mandated.

▪▪▪ It must also be recognized that hearings before the Commissioner (*nee* the ALJ and the AC) are nonadversarial in nature, and oblige the adjudicator (AC and ALJ) to ensure that the hearing record is complete. Specifically, it is the adjudicator's duty to investigate the facts and develop the arguments, both for and against granting benefits. *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 147 L.Ed.2d 80, 88 (2000); *Welch v. Bowen*, 854 F.2d 436, 438

(11th Cir.1988); *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir.1981); *Wilson v. Apfel,* 179 F.3d 1276, 1278 (11th Cir.1999); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997). Furthermore, the ALJ must comply with this obligation even if the claimant is represented by counsel. Indeed, this Court's review of the case is generally limited to a consideration of the evidence in the certified record.[2] *Wilson v. Apfel,* 179 F.3d at 1279.

When reviewing the Commissioner's decision, the duty of the Court is not to reweigh the evidence, but rather to determine whether the decision is supported by substantial evidence in the record, and whether the Commissioner applied the correct legal standards. *Smith v. Bowen,* 792 F.2d 1547, 1549 (11th Cir.1986). Substantial evidence has been defined as "more than a scintilla...it means such relevant evidence as the reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982). This Court must examine the record as a whole, however, and may not affirm the Commissioner's decision by referring only to those parts of the record which the support the same. *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir.1983). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456, 467 (1951) (Frankfurter, J.).

**PART FOUR EVALUATION OF THE EVIDENCE**

**A. *THE OBJECTIVE MEDICAL EVIDENCE***

■ The record contains a number of records from Dr. F. Mumiaz, apparently a chiropractor, from May 13, 1986 through December 14, 1993.[3] Tr. 195–249. These records also include medical records from the Pizza Clinic of Chiropractic (Tr. 208, 246–249) and from Dr. Daniel E. Zdonczyr, M.D., a neurologist with the Atlanta Neurological Institute (Tr. 220). None of these dysfunctions are relevant to the instant issues except for a September 28, 1993 notation indicating that the claimant underwent back surgery on August 6, 1993. Tr. 203. The records from such surgery are not included herein. Accordingly, these records will not be discussed further.

*Dr. Charles F. Scott, M.D.*

On March 20, 1991, the claimant saw Dr. Charles F. Scott, M.D. with complaints of rhinitis, a sore throat, severe rash, running nose, lymph gland, bloody cough, after falling on her chest. She weighed 198 pounds. He made no diagnoses. Tr. 351. She returned with complaints of abdominal pain on January 20, 1994. On examination, her liver, gall bladder, renal, aorta and pancreas were all normal. Tr. 345, 348–350. He thought her symptoms sug-

---

**2.** Of course, under appropriate circumstances, this Court can consider new relevant medical evidence in support of a properly filed motion for remand.

**3.** Ordinarily, records from a chiropractor do not constitute evidence from an "acceptable medical source" within the meaning of 20

C.F.R. § 404.1513(a). *See Crawford v. Commissioner of Social Security,* 363 F.3d 1155 (11th Cir.2004) 363 F.3d 1155, 2004 WL 595281; *Falge v. Apfel,* 150 F.3d 1320, 1324 (11th Cir.1998). Here, the issue is irrelevant as the records predate the disability onset date.

gested gallbladder (?)[4] R/O PUD, gallstones (?). An air contrast barium enema on January 27, 1994 suggested (1) 2 small polyps and (2) large redundant colon. Tr. 331–332, 347–348. She returned on January 21, 1994 (notes are illegible) except (1) scheduled air barium enema, (2) UGI + SBS + 3, (3) (illegible). He also referred her to Dr. Gary L. Richter, M.D., who first saw her on February 25, 1994.

### Dr. Gary C. Richter, M.D.

Gastroenterologist Dr. Gary C. Richter, M.D. Richter examined the claimant on February 25, 1994. Tr. 300–305. On March 1, 1994, he advised Scott of his findings: (1) history of abnormal barium enema with colon polyps. Schedule colonoscopy and possibly polypectomy, (2) episodes of abdominal pain, with left flank and back pain, rule out renal in origin, irritable bowel syndrome, (3) symptoms of irritable bowel syndrome, (4) periods of nausea and vomiting, possibly gastroesophageal reflux disease. Tr. 297–299.

On March 2, 1994, Richter scheduled an endoscopy for March 16, 1994. Tr. 296. On March 16, the claimant underwent the endoscopy because of dyspepsia, abdominal pain, nausea, and vomiting. The procedure was performed on that date and the only significant finding was a hiatal hernia. He also notified the claimant on March 13, 1994 that her polyps should be removed. Tr. 293. He further notified her that she had elevated cholesterol and triglycerides. Tr. 286–291, 292, 295. *See also* Tr. 250–266.

On March 25, 1994, Dr. Scott again referred the claimant to Dr. Richter for a colonoscopy based on a history of colon polyps. The claimant tolerated the procedure well, and his findings were (1) suboptimal exam secondary to retained stool, internal hemorrhoids, no polyps seen. Tr. 282–285.

On April 8, 1994, Richter notified the claimant of her borderline cholesterol at 232 and elevated triglyceride level (503). Tr. 279.

On September 22, 1994, she underwent X-rays of her lumbar spine which demonstrated a disc space narrowing with minimal end plate sclerosis at L5–S1, consistent with degenerative disc disease. A minimal scolitic deformity of the lumbosacral.

### The Fulton County Department of Mental Health

On March 18, 1992, the claimant visited the Fulton County Department of Mental Health. Although most of the notes are illegible, she was apparently depressed. She also abused alcohol as a teenager. Tr. 472–73. She was also evaluated on December 12, 1994. At that time, she was not as depressed, but had suicidal ideations, crying spells and feeling of helplessness and hopelessness. Tr. 471. Her list of prescribed medications were: (1) Desyrel 50 mg, 12/12/94 (471), 12/24/94, 1/30/95, 11/30/95; (2) Visteril 25mg 3/18/92 (472), 12/14/94, 1/30/95, 11/20/95. Tr. 470. In addition, the record contains a "To Whom It May Concern" note indicating that on February 9, 1998, she was a resident of its Supportive Living Program. Tr. 1056.

---

4. Notations such as "(?)" indicate that this Court was unable to read the entry because it was illegible.

### Dr. Tucker, M.D.[5]

On June 13, 1993, she saw Dr. Tucker, M.D., with complaints of lower back pain, stress, incontinence (with cough), leg tingling, can't feel sex like she used to; can't tell when time to urinate and defecate. On examination, her abdomen was soft, active bowel sounds, sensation intact in both legs; good sphincter tone. Assessment was left leg numbness, perineal sensation. Tr. 333.

On January 31, 1994, she underwent an upper GI and small bowel X-ray series; and a small sliding hiatal hernia was noted as was gastro-esophageal reflux; no evidence of esophageal ulcer and the balance of her upper GI and SB were normal. Tr. 344–43. On a February 7, 1994 visit, she complained of chest pain with a cough. The diagnosis is illegible, but her weight was 194 pounds. Tr. 340. She returned on February 15, 1994. The complaints are illegible. Assessment was "HH" (hiatal hernia?) w/GERD and ? colon polyps. She weighed 193 pounds. Tr. 341. She may have also returned on February 24, 1994. Tr. 340.

On March 14, 1994, she returned and complaint of? [both her complaints and the assessment are illegible]. She weighed 192 ½ pounds. Tr. 339–40. A May 13, 1994 visit notes "had the ? c/o ↑ appetite"; assessment is illegible. She weighed 190 pounds. Tr. 338.

She returned on August 2, 1994, complaints and assessment are illegible, but she weighed 209 pounds. Tr. 337.

She returned again on August 12, 1994. The doctor noted she weighed 212½ pounds and was still going to "psych." Balance of the report is illegible. Tr. 336. A 9/8/94 visit noted her weight at 214 pounds, and that the claimant was going to see Dr. A. Green that day. She apparently had an MRI which showed a three-disc problem. Assessment was "AN" and disc ? Tr. 335.

On June 14, 1993, the claimant visited GMH with complaints of lower back pain for which she had been seeing a chiropractor for the past 1—2 months. The LBP radiates down both lower extremities and burning pain in LLE. POS: denies trauma; walks with problem but with some mild ache in L thigh causing occasional limp. Able to control bowel & bladder. PMH: HTN (past medical history of hypertension). Pt. in NAP back—mild tenderness over pain lumbar areas. ΘSLR bilat. but with ↑ ed pain. LE neuro → PTR's 2+ + = bilat; motor 5/5X = bilat ind. EHL; l position sense on each large toe back pain—possible HNP sensation intact to spine. Tr. 316.

On June 30, 1993, the claimant visited the GMH Orthopedic Clinic with complaints of low back pain for many years, paralysis, numbness, pain, burning, tingling, sore to the touch from legs and feet to shoulders, alternating L + ®. She also had a history of TB in 1987. She also went to a chiropractor for her lower back pain for several months. Also possible "sequella", bulimia, warts? fungal nail infections, vomiting and "a great deal of sleep in her life." On examination, the doctor noted: reserved? speech, wearing ? on moving NAD. Morning ? with lying supine. ⊕ ® SLR for back pain at 40°—L SLR DTRS. 2 + = B at patellar tendon, allutler tendon, EHL, QUADS GAS/SOL, HAMS, ? PTB all 5/5 bilaterally wart on R index finger fungal infx L thumb. X-rays mild facet disc L spine. Imp. ? in pt. with

---

**5.** First name not included.

mult. factorial ? and physiologic complaint incl LBP. Tr. 315.

On July 14, 1993, she underwent an MRI of her lower spine. Results showed a left lateral disc herniation at the L5–S1 disc space which could compress both the L5 roots and the S1 root; otherwise normal. Tr. 314.

On August 5, 1993, the claimant was admitted to GMH for surgical treatment of her left L5–S1 herniated nucleus pulposus, and underwent a left L5–S1 laminectomy with diskectomy and L5 foraminotomy. She was discharged on August 9, 1993. Tr. 459–463, 465–467. She returned to GMH on October 21, 1993 complaining of lower back pain, neck pain and L ankle pain, after sustaining a fall. After examination, the diagnosis was an ankle strain and lower back musculoskeletal strain, which were treated conservatively. Tr. 468.

### Grady Memorial Hospital

On October 21, 1993, she went to GMH with complaints of lower back pain, neck pain, and left ankle pain. She was diagnosed with left ankle strain and lower back strain. Tr. 313.

X-rays of her lumbar, and cervical spine and of her ankle were also made on October 21, 1993. They showed a narrowing of the disc space at L5–S1, otherwise normal. Tr. 312.

On November 30, 1993, the claimant visited Grady Memorial Hospital (GMH) with complaints of increased lower back pain. She previously had surgery with good results, but fell which aggravated her lower back and neck pain. Her neurological signs were all normal except for left ankle reflex and her knees. She was referred to physical therapy. Tr. 311. On that visit, the doctor indicated her lower back and neck pain were improving; and she was directed to undergo more physical therapy. Tr. 464.

She returned again on June 5, 1994 with multiple complaints unrelated to her lower back, including anxiety, ulcers that bleed, stomach pains. As she kept talking non-stop, the doctor referred her to psychiatry for stress control. Tr. 457–458.

On November 17, 1994, the claimant was apparently involved in a motor vehicle collision in which she was a passenger, sustaining blunt trauma. She was taken to the GMH emergency room with complaints of neck and lower back pain radiating into lower left extremity. The report also noted a past medical history for suicidal ideation, and the lumbar laminectomy. On examination, back pain was noted. Straight leg raising was negative. Diagnoses were cervical and lumbar strain. Tr. 454. The hospital also made X-rays of her cervical and lumbar spine. The cervical spine was normal; the lumbar spine was normal except for the laminectomy. Tr. 453.

She returned again on March 5, 1995, with complaints of lower back and lower extremity pain. The examining physician was unable to detect a reason therefor. She also complained of urge incontinence. Past medical history noted (1) Etoh abuse, depression, suicidal ideation, HTW, sinusitis, GERD, GI upset w/NSAIL, PSHX. The physical examination was essentially normal as were lumbar spine X-rays. Tr. 440, 450–451.

She returned again on April 7, 1995 after twisting her ankle. As the ankle appeared swollen, a splint was applied. Diagnosis was ankle sprain. A somatization disorder was also diagnosed. Tr. 448–49.

On August 1, 1995, she underwent a mammogram with normal findings. She also complained of lower back and ankle pain. She also had vision problems. Past medical history noted HTP? Hiatal hernia ? panic attacks. Diagnoses were: (1) LBP: refer pt to orthopedic clinic, (2) anxiety: continue ? meds, (3) visual acuity: opthalmalogy. Tr. 445–447.

She returned to the orthopedic clinic again on August 18, 1995, with a complaint of urinary incontinence, blurred vision, except for myopia and astigmatism. Again, her past medical history included a diagnosis of a somatization disorder. She also had less bowel control. The doctor observed that she ambulated with an unsteady gait, antalgic gait, *talks unnecessarily*, does not make eye contact, often almost manic at times, flight of ideas? can bend and take off shoes with difficulty, stands from sitting easily—however groaned with any exam. Waddells—TORDS 5/5. The exam was essentially normal. Tr. 441, 443–44.

She returned again on September 7, 1995 with multiple complaints. Her exam was, however, unchanged. The doctor again sent her to physical therapy. Tr. 442.

On September 28, 1995, she returned to physical therapy again on referral from the orthopedic clinic with complaints of severe lower back pain. She was issued a "back book" and instructed in a home exercise program. Tr. 438.

On September 7, 1995, the orthopedic clinic referred her to the pain clinic because of her complaints of chronic pain (no surgically detectable problem). On November 13, 1995, a physician (illegible) replied noting a ⊕ MRI in 8/95, showing L5–S1 disc disease. Tr. 958, 986.

On September 13, 1995, she again returned to GMH for a gynecological examination, with complaints of lower back pain. Past medical history included anxiety disorder, pain sensitivity lower back, history of urinary incontinence with and without stress. No significant findings noted. Tr. 959, 996.

On November 13, 1995, the claimant returned to GMH with complaints of chronic lower back, neck and lower extremity pain. Her past medical history included somatization. On examination, she had ⊕ SLR at 30° on L and 40° on R; severe tenderness on palpation throughout lower back L EHL 4/5, R EHL 5/5. ↓ cold sensation L ankle and foot but ↑ sensation to pinprick patella R 2+, L 1+, ankle jerk unable to evaluate pt c/o severe pain when Achilles tendon tapped w/ reflex hammer. This patient is not a good candidate for pp dural steroid injection. Tr. 957, 995.

### Dr. John G. Morrow, M.D.

### Grady Memorial Hospital

On November 13, 1995, a second physician, John G. Morrow, M.D., reviewed the findings and examined and interviewed the claimant, agreeing she was suffering from a somatization disorder as well as chronic low back pain. She needed to lose weight and continue with physical therapy. Tr. 957, 995.

On April 22, 1996, June 6, 1996 and July 21, 1997, she had her ears examined because of complaints of constant cough, hearing loss and jaw pain. Other than TMJ, no significant findings were noted. Tr. 953, 955, 956, 991, 993, 994.

### Dr. Bodie N. Dunlap, M.D.

### GMH Psychiatry Emergency Clinic

Apparently, at some date prior to July 18, 1997, she was seen by Dr. Bodie N.

Dunlap, M.D. in the psychiatry emergency clinic, admitted and discharged on July 18, 1997. It was noted that she had a history of alcohol abuse until that February. She exhibited depression and anxiety, but was not psychotic. Diagnoses were:

AXIS I:[6] dysthymia;

AXIS II: deferred;

AXIS III: arthritis, nausea with narcotics;

AXIS IV: homeless;

AXIS V: 60/unk.

Tr. 990.

On July 21, 1997, she underwent her annual gynecological examination. Results were normal. Tr. 952.

On August 1, 1997, she returned with complaints of chronic stomach pain, chronic diarrhea. Dr. Theodore Antison noted that she had a somatization disorder L/o multiple symptoms, GERD since 1994, gallstones diagnosed in 1996. He referred her to "GI". Tr. 951, 982.

On August 21, 1997, she was seen in the mental health unit. Apparently, the doctor noted ETOH abuse, but the notes are mostly illegible. Her mental status examination was normal. Diagnoses were:

AXIS I: 300.4;

AXIS II: Ø

AXIS III: ↓ (disc deterioration, hiatal hernia, Briquet's syndrome/somataform disorder). She also suffers from depression.

Tr. 947, 987.

On September 16, 1997, she underwent a mammogram. Findings were normal. Tr. 945, 984.

On October 8, 1997, she again returned to GMH. She apparently was seen by a social worker. Her mental status exam was normal. Diagnoses were:

AXIS I: 296.32, 300.81;

AXIS II: Ø;

AXIS III:(1) disc? (2) Briquet's syndrome, (3) hiatal hernia, (4) acid reflux.

It was also noted that her application for social security benefits was denied. Tr. 944, 983.

On October 17, 1997, the claimant returned apparently complaining of numbness, ? down L leg. Tr. 1,000.

On October 31, 1997, Drs. Theodore J. Antinson, M.D., Attending Physician, and Dr. Kelly Cobb, M.D., Resident Physician, jointly wrote a "To Whom it May Concern" letter, indicating that the claimant is being treated at GMH for multiple medical and psychiatric problems. Specifically, she suffers from a "somatization disorder (formerly known as Briquet's syndrome), a chronic disorder characterized by multiple somatic symptoms in multiple organ systems. She is severely disabled by this condition and requires frequent medical followups."

She also "has significant problems with major depression, panic attacks, arthritis, and gastroesophageal reflux." Tr. 970.

She returned to the mental health unit on November 5, 1997, and was seen by a social worker (signature illegible). Her mental status examination was essentially normal, although she was hyper verbal, pressured, reclusive, rambling, responds to structures. Diagnoses were:

---

**6.** References to "AXIS" presumably refer to the Diagnostic and Statistics Manual (DSM)— IV Edition.

AXIS I: 296.32, 300.81;

AXIS II: Ø;

AXIS III:(1) disc?, (2) Briquet's syndrome, (3) hiatal hernia, (4) acid reflux.

Tr. 942.

An urgent care center assessment dated November 18, 1997, apparently notes that her cholesterol level is 263; NAD arthritis. She also complained of heartburn and pain. Tr. 938–940. She was referred to GI for the heartburn.

Apparently, on December 17, 1997, and on another occasion, including "___/24/1998 and 5/28/98," she also had an opthalmalogic examination, including a prescription for eyeglasses. Tr. 937, 938, 1002–03, 1007.

Apparently, on December 31, 1997 [7], she returned with complaints of ↑ epigastric pain, spasms, regur digested food, poor sleep, muscle soreness. The physical exam noted (1) abdomen: BSND soft? epigastric area & LLQ. It was also noted that she suffered from (1) somatization disorder, (2) GERD, and (3) back pain. Tr. 946.

Another entry apparently dated 12/31/97 [8] noted that she returned two weeks later for a follow up to her complaint of LLQ pain with episodes of painful defecation. ? tensing of ? muscles, weakness, loss of concentration and blindness, sore throat, tingling in arms & neck like cold chill ↓ ADLs, left leg ↑ aching, extremely anxious, hyper talkative, agitated. She also had (1) a somatization disorder, (2) diarrhea, (3) weakness/hearing, (4) HNT ↑ 2° anxiety ?. Somatization out of control, attempted to explain multiple unexplained complaints? Tr. 948, 985.

7. Actual date not disclosed.

8. Actual date not disclosed.

9. Actual date not disclosed.

A third entry apparently dated December 31, 1997 [9] notes that she returned with a throat inflammation, swelling in L wrist, off & on fire for three weeks, ? tightness in throat "choking," also had a syncope episode. Her past medical history noted thirteen problems:

1. HTN,

2. GERD,

3. disc disease,

4. gallstones,

5. diarrhea,

6. arthritis,

7. panic attacks,

8. stress incontinence,

9. hemorrhoids/polyps,

10. depression,

11. somatiform/Briquet's synd.,

12. hearing loss,

13. poor vision.

Tr. 950, 989.

On March 7, 1998 [10], the claimant returned to the orthopedic clinic for a follow up to her chronic lower back pain. The physical exam noted that she walked with L L E extern rotated o/w with L gait, motor 5/5 (B) ue/le, sensory retract/? (B), knee/hip ROM benign, (-) tw? sign, X-rays: ? cervical spondylosis, [illegible character] evid. of instability, lumbar spine with mild DDD/DJD, ? A/P 40 year old female with cervical & lumbar spondylosis, No evid. of radiculapathy? (Tr. 941, 981). The doctor also noted she had a significant psychiatric history, including somatiform disorder.

10. Actual date not disclosed.

She returned to the mental health services on May 6, 1998, apparently for group therapy and stress management. Her anxiety had increased, and increased coping skills. However, she hadn't gotten out of her chair for 3—4 days and was wearing a knee brace. The mental status exam. was essentially normal. Diagnoses were:

AXIS I: 296.32, 300.81, 300.19.

Tr. 935.

She returned again on May 13, 1998 for group psychodiscussion—wellness? to decrease depression and impulsivity, and increase knowledge of vitamins A and K. In summary, she only had fair participation and was still depressed. Mental status exam varied from good to poor. Diagnoses were:

AXIS I: 305.00, 300.2, 300.81, 296.32,

AXIS II: Ø,

AXIS III: 401.9, 530.81, 553.3, 722.6, 795.5.

Tr. 934, 1014.

On May 18, 1998, the Director of Epidemiology telephoned the medical department to advise that the claimant may have been exposed to measles. The claimant, who was present, denied her decongestant for sneezing and runny nose for past 3 months, but had reflux and may have had measles as a child. Tr. 933, 1013.

On May 20, 1998, she underwent an upper endoscopy by Dr. Charles Duckworth, M.D., Division of Digestive Diseases. He had observed a slight abnormality in her food tube (Barrett's esophagus) which protects against acid reflux. The biopsy was negative for cancer. Tr. 929–932, 969, 1008, 1010–1012.

On May 28, 1998, she underwent another eye examination. The results were normal, with myopia with a history of astigmatism. Tr. 928.

She returned to the Otolaryngology Clinic on June 2, 1998 with complaints of a hearing loss and throat problems. Diagnosis was (1) severe GERD, hiatal hernia (barretts esophagus) followed by GI, (2) long standing moderate to severe SNHL. Tr. 927

She returned to the Mental Health Clinic on June 26, 1998 for group therapy to reduce her depression, reduce suicidal ideation, increase coping and social skills. Her mental status exam was essentially normal. Diagnoses were:

AXIS I: 305.00, 296.32,

AXIS III: 555.3, 401.9, 530.81, 722.6, 795.5.

Tr. 926.

She returned to the Gynecology Clinic on June 30, 1998 for her annual examination. She also complained of abdominal discomfort—diffuse ↓ abd on L in ? on ® midcycle ⊕ bloating. S/P—TVH with endometriosis & fibroids. Ovaries remain? IBS barretts esop., anxiety, PMMX—herniated disc, HTN, neuropsych—TVH 1994. Diagnoses were: (1) abdominal discomfort, (2) somatization disorder, (3) HTN, (4) Barretts Esop., (5) IBS. Tr. 925.

She returned to the Mental Health Clinic again on July 10, 1998 for group therapy to decrease her depression. Her mental status exam was essentially normal, although it was noted that she was smiling in a dramatic manner while discussing health problems. Diagnoses included:

AXIS I: 296.32, 300.19, 300.81, 305.00,

AXIS III: 795.5, 278.00, 553.3, 401.9, 722.6.

Tr. 923.

On August 5, 1998, she underwent a sonogram examination of her pelvis and

vagina. Results showed that she had undergone a hysterectomy with her ovaries intact and normal; and abnormal masses in her pelvis were identified. The examination results were negative. Tr. 920.

On August 13, 1998, she returned to the Gynecology Clinic for a follow up to her June 30, 1998 examination. Assessment was: (1) diffuse lower abdominal discomfort, hx IBS heuro injury, G/w/?. Tr. 919.

She returned to the Orthopedic Clinic on August 18, 1998, with complaints of a soft corn and bony prominence under the 3rd and 4th toes of her right foot with relief from padding. She also has multiple psychological problems. PE showed hot corn w / oip at 4th toe w / prominent callus at PIP, lateral 3rd toe. Diagnosis was: (1) R foot mortous neuroma, (2) R 3rd and 4th toe bony prominence, (3) recommended removal of metatarsal foot pad. Tr. 718A.

On August 24, 1998, she went to GMH complaining that she had rash that itched, night sweats, difficulty walking, has seen ENT and GI concerning her throat/GERD. Diagnoses were: (1) HTN → borderline high dcast. cont to observe (2) reflux → GI (3) somatization disorder, (4) arthritis[illegible character] stable—right knee ... worse on walk, (5) rash. Tr. 918, 1009.

On August 24, 1998, she went to the Neurology Clinic with complaints of asthma attacks, whole body numbness R side neck pain, R leg numbness, R neck and R arm pain with intermittent (B)ue "t?," L leg numbness and side pain, diffuse (B)ve numbness, arm pain, daily non-fluctuating burning in all limbs. Diagnosis included (1) multiple somatic complaints with somatization D/O, (2) ↓ Lankle reflex L/N, S/P L5–S1 laminectomy. Tr. 916.

On September 11, 1998, Dr. Cobb wrote another "To Whom It May Concern" note advising that GMH was currently treating the claimant for fibromyalgia, somatization, D/O, GERD & HTN. He noted that it was a disorder consisting of fibrous tissue, possibly forming benign tumors within one or more muscles causing pain to which may develop muscle debility (weakness). Tr. 913.

He was hopeful that with treatment, albeit with frequent medical evaluation for the next few months, she would improve.

He also noted that she was taking a medication that causes hypersensitivity to sunlight/heat and directing that she avoid outside activities on hot, humid days. Tr. 913–15.

On October _____, 1998 [11], she again returned to GMH with complaints of diarrhea, nausea, fatigue, L side pain, burning in foot, leg and abdomen, burning and tingling in her arms and face, weakness spells, severe reflux? fibromyalgia, hx of C6 fracture. Diagnoses were (1) somatization—off med, (2) GERD (Barretts) [illegible character] cont. operable/ cisa pride, (3) arthritis stable, (4) HTN without TC now will consider?, (5) neuro/weakness. Tr. 912.

On October 14, 1998, she was admitted to GMH, and on October 15, 1998, she underwent surgery on her right foot to excise interdigital nerve of the second web space. Diagnoses were: (1) Morton's neuroma, and (2) possible metatarsal phalangeal joint synovitis right foot. Tr. 972–978.

On October 17, 1998, a physician (signature illegible) referred the claimant to the Orthopedic Clinic because of her com-

---

**11.** Exact Date not disclosed.

plaints of recurrent history of numbness/? down L leg. He also noted she has a somatization disorder. Tr. 943.

On October 26, 1998 [12], she returned to the Medical Clinic with complaints of LLE edema with walking, dizzy spells, increased depressive history, lower abdominal cramp-like pain. Asking for pain medication on examination, Dr. Cobb found low anxiety, heent—clear, CV—RRR w/80, lungs—CTA, abdomen—benign ?, extremities [illegible character] edema. Diagnoses were: (1) somatization, (2) GERD → Barretts → con ameaozale, GI following ? repeat endoscope, (3) arthritis—back pain, (4) GYN—/ drt pap last week; m/s sched to invest abd. 5 X, (5) HTN → stable, (6) weight vgain—diet / exercise. Tr. 922.

### The Fulton County Alcohol & Drug Treatment Center

Commencing on January 5, 1995, the claimant was treated at the Fulton County Alcohol and Drug Treatment Center for her alcohol dependence and depression, with a goal of detoxification. Her treatment commenced on January 17, 1995, and continued daily for six days. Tr. 352–360.

### The W.T. Brooks Clinic (Grady Health System)

In connection therewith, she was also treated at the W.T. Brooks Clinic, a part of the Grady Health System. On an unknown date she complained of an illegible problem. The assessment was HTN, dizziness, anxiety / depression, hiatal hernia. The report also noted her previous surgeries, including plytectomies, appendectomy, L5–S1 diskectomy. Tr. 366. She was also seen on December 6, 1994 with a complaint

12. Actual date may be July 10, 1998.

of high blood pressure, dizziness and blackout spells. The balance of the report is illegible. Tr. 365. She had a follow-up appointment on December 15, 1994, most of which is illegible, although it notes in general, very anxious, non-stop talking, BP unable to hear, pulse reg. occasionally premature beat not strong, it + reg occasional repuature beat, lungs clear ?, abd. epigastric tenderness normal bowel sounds, fundi No ? exudites ? BS 85, UIA WNL. Assessment was anxieties and hypertension. Tr. 364. She again returned on February 14, 1995. It, too, is mostly illegible— (C) general extremely anxious, nonstop talking, ?—WNL, throat no redness post?, neck [illegible character] ademopathy, lungs no rales, ?, abd. normal bowel sounds, epigastric tenderness. Assessment: URI, hiatal hernia, anxiety. Tr. 362.

### South Fulton Medical Center

On June 13, 1993, Dr. _____ Tucker admitted the claimant to the South Fulton Medical Center apparently for lower back pain. The doctor noted L leg numbness and a perineal sensation and discharged her. Tr. 333–334.

The record also contains mostly illegible office notes from Dr. Charles Scott, covering the period March 20, 1991 through September 8, 1994. Tr. 335–346.

As previously noted, on January 27, 1994, Dr. Charles Scott, M.D., admitted the claimant to the South Fulton Medical Center with complaints of abdominal pain and for an air contrast barium enema. Results showed (1) two small polyps in the mid-transverse colon, and (2) large redundant colon. Tr. 332, 346, 347–50. He readmitted her again on January 31, 1994

for a GI and small bowel X-ray series. Results were (1) a small sliding hiatal hernia, (2) otherwise normal GI and small bowel. Tr. 331.

On February 21, 1994, Dr. Michael Schlossberg admitted the claimant to the South Fulton Medical Center with complaints of lower back pain/flank/ abdominal pain, urinary frequency. Tr. 325. Abdominal X-rays were normal. No other findings are noted. Tr. 318–330.

On March 24, 1994, the claimant was again admitted to the South Fulton Medical Center by Dr. Michael Schlossberg. Complaints were uterine prolapse and stress incontinence. She was discharged on March 31, 1994. While hospitalized, Dr. Schlossberg performed a dilation and curettage, vaginal hysterectomy, interior and posterior repair and enterocele repair. Final diagnosis was (1) "cystocele with stress urinary incontinence, (2) rectocele, (3) enterocele, (4) third degree uterine prolapse, (5) menometrorrhagia, and (6) removal of a small segment of endometrium showing estrogen withdrawal, bleeding, mild chronic cervicits, luomyoma, interi, vaginal mucosa with patchy mild inflation". Tr. 267–278, 1026–1054.

The claimant, who underwent back surgery in 1993 at L5–S1, continued to complain about multiple body problems; was also apparently sent to the South Fulton physical therapy department for 13 treatments (whirlpools, ultrasounds, ?), therapeutic exercises and home exercises on 11/3/93, 11/22/93, 1/5/94, 7/18/94, 7/20/94, 7/22/94, 7/25/94, 7/29/94, 8/1/94, 8/3/94, 8/5/94, 8/10/94. Part of the report is illegible. Tr. 317–330.

### Georgia Regional Hospital

On November 17, 1994, the claimant was admitted, apparently from the South Fulton Mental Health Clinic, to the Georgia Regional Hospital for depression and as a danger to herself. Tr. 369–397. (Tr. 772–811 [duplicate], 1057–1099 [duplicate]). The claimant also indicated she was suicidal. On admission, Dr. A. Ahamed, M.D., noted that her mental status was essentially normal. Tr. 371, 378–79. Her admission diagnoses were:

AXIS I: Major depression, recurrent and dypthemia,

AXIS II: Deferred,

AXIS III: (refers to physical examination.) *See* Tr. 392–397. Apparently, she also abused alcohol which may have been in remission. Tr. 374, 379. (Tr. 373).

AXIS V: Current GAF 40; highest GAF—70. Tr. 391.

During her stay, she was apparently seen by Dr. Cray and another physician (signature illegible), in addition to Dr. Ahmad. Her diagnosis on discharge on November 24, 1994 was:

AXIS I: Dysthemia # 300.40,

AXIS II: "hold",

AXIS III: Chronic lumbar back pain, HTN (Hypertension) # 724.5, 401.9. She was also no longer suicidal. Tr. 374. (doctor's signature illegible). Medications were Desyrel 50 Pa RHS Flexeril 10g., Potid, Zoubic 150K, Pobid; Buspar 5g. Potid and Cayoher 25g. P.O.A.D. Tr. 373.

### Dr. E. Clifford Beal, M.D., Psychiatrist

At the request of the Fulton County Alcohol and Drug Treatment Center, she was also treated by psychiatrist E. Clifford Beal, M.D., from June 14, 1994 to September 12, 1994 on 18 occasions, including her

initial one-hour interview. Tr. 398. She was upset about her living conditions, inability to care for her children, substance (alcohol) abuse. She was agitated with feelings of hopelessness, helplessness, and inability to sleep. She was also unable to grasp the reality of her situation and follow through with real concrete measures. His diagnoses were: (1) major depression (bipolar) 296.5, with suicidal ideations, (2) possible delusional disorder 297.1, (3) alcohol related disorder 291.9. Tr. 398–99. When he last saw her on September 12, 1994, her prognosis was not good. Indeed, his treatment notes reflect periodic alcoholic drinking binges. Tr. 404–405. *Id.* The referral note from FCADTC indicated that the claimant was scheduled to undergo an outpatient detox program on January 16, 1994 in connection with her alcoholism; and he was requested to recommend medicare benefits. Tr. 399.

### Butts County Medical Center

According to the claimant's former attorney, Michael Brewster, the claimant also visited the Butts County Medical Center on August 25, 1995.[13] The medical records note that she has multiple health problems, and a long history of depression for which she is taking Desyrel 50 mg. and Vistoral 25 mg. The physician (no signature), who apparently saw her, noted that she was oriented in three spheres: her affect/mood was sad, with mild anxiety; her speech was coherent; denied alcohol problem and "HIS" ideation. His/her diagnosis was (1) Dysthemic Disorder, ? ? ? ? ? ?, and she should increase the Desyrel to 75 mg. per day. Tr. 475–76.

### Vision Psychological Rehabilitation Program

Commencing on August 28, 1995, the claimant was treated at the Vision Psychological Rehabilitation Program (apparently Dr. ? Allen). The claimant had a list of multiple health problems, including a long history of depression being treated with 50mg. of Desyrel and Vistral 25 mg. She also complained of multiple family stresses. On examination, she was oriented X3, her affect/mood was sad, mild anxiety, speech: coherent; denies alcohol and H/S ideation. Assessment was dysthemic disorder, moderate: increase Desyrel from 50 to 75 mg/day. Tr. 857.

On November 27, 1995, she returned and reported doing better. Apparently, the doctor discontinued her Desyrel. *Id.* She returned again on August 5, 1996. The doctor reviewed her Visteral and Desynex. Tr. 856. She returned again on August 26, 1996, complaining of being defensive, angry, panicky, overwhelmed. She also reported that the Visteral interfered with her driving, while Desyrel helps her sleep. Every time the doctor attempted to obtain a history, the claimant got more and more agitated. She reported turning to alcohol in the past, but no longer; but her husband abuses alcohol and her children. On examination, she was alert and oriented. Speech coherent; affect anxious; mild agitation; depressed; talks non-stop about her complaints; denies stating she would kill herself. She had trouble understanding and a hearing loss. Assessment was: (1) depression disorder (R/O major depression), (2) anxiety disorder NOS. Tr. 854–55.

**13.** The ALJ describes a number of visits and treatments at the Butts County Medical Center from August, 1995 through August, 1997. Tr. 493–94. He also refers the reader to Exhibits 36, 46, B–6F and B–32F. Tr. 494. This Court can only find the single entry described above (Exhibit 36). Exhibit 46 (p. 46) is ALJ O'Steen's opinion, Exhibit B–6F are records from the Vision Psychological Rehab. Program (Tr. 851–57), Exhibit 32F are duplicates thereof. Tr. 1154–1160. Thus, the ALJ's opinion is in error.

Another visit (date unclear ___/23/96) notes that the claimant complains of panic attacks, stomach pain, and concern about medications. On examination, she was alert and oriented, speech coherent, affect-anxious, hyperverbal, wringing hands? Assessment was: Desyrel helps with sleep, Effexor beginning to help with depression, anxiety still a problem. Tr. 855. She returned again on October 21, 1996 with complaints of many medical problems, blood pressure fluctuating, headaches associated with back pain; can't take medicine because of stomach. She is quieting down and more at peace. On examination, she was alert and oriented; anxiety improving; depression improving; focus is on ? about ? physical symptoms. Assessment: mental status improving despite physical pain. Tr. 853. On February 24, 1997, she returned again with many physical complaints: nausea, diarrhea, flu symptoms, talks non-stop with much annotation about meds/physical problems. Apparently, a doctor told her Effexor is not causing her problems and has decreased her anxiety. On examination, she was alert, oriented, speech coherent, c/o panic attacks. Moodanxious. No psychoses. Assessment was: needs to get back on more effective doses of Effexor and use Desyeral to sleep. Tr. 852.

She reported on her May 5, 1997 visit that she was going to have bladder surgery. Still takes Effexor; sleep irregular, but Desyrel helps. On examination, she was alert, oriented, hyperverbal, numerous somatic complaints, feeling more depressed and anxious, and worries about her future. Tr. 852. The last entry, dated 8/19/97, noted that she was told that the doctors at Grady had not given her adequate care. She also has a hiatal hernia, being lactose intolerant, lower gluton problems, irritable bowel syndrome, and proba-

bly gallstones. She was also told that the ? meds she is on too much and ? causing more medical problems such as muscle trembling, twitching, sweating, tremors, and feeling very weak. She is scared to eat because of sore throat down to her stomach. Once food is in her stomach, it's uncomfortable, so she intentionally throws up. She is going to transfer treatment from Grady to DeKalb psychiatrist. On examination, she appeared confused about what she had been told by Grady doctors. She feels many of her meds and improper care are causing problems. Flat mood; anxious affect; no psychotic? voiced or observed. No S/H ideations; poor insight and judgment. Feels GI M.D. and psychiatrists should have been coordinating. Assessment was: depressed, anxious, nervous, medical problems. Tr. 851.

### Dr. Khaled Jalil, M.D.

Commencing on October 24, 1996, the claimant visited Dr. Khaled Jalil, M.D. and the Henry County Medical Center on the referral of Dr. Vickie Jones. Tr. 18–32. His initial assessment was to rule out esophagitis, as she had complaints of pyrosis and reflux. Tr. 29. On October 25, 1996, he performed a distal esophageal biopsy, which assessments were positive for helicobacter pylor, and the gastric mucosa displayed chronic gastritis with focal lymphoid aggregates. Diagnoses were: (1) Grade 2 esophagitis, (2) hiatal hernia, and (3) antral gastritis. Tr. 28, 30–32. She also had follow-up visits on 11/1/96 (Tr. 27), 11/15/96, 12/5/96 and 1/16/97. Tr. 20, 23, 27. On November 18, 1996, she also underwent a colonoscopy because of chronic, persistent diarrhea. Diagnosis was: (1) collagenous colitis, (2) colon polyp, and (3) internal hemorrhoids. Tr. 22. She also had a CT scan of her abdomen and pelvis on January 22, 1997. Her liver, spleen,

and pancreas were within normal limits; calcified gallstones were in her gallbladder; normal kidney functions, no retroperitoneal adenopathy was seen, and the abdominal aorta was normal. Portions of the sigmoid and rectum were incompletely distended, and there was a thickening of the bowel wall. The uterus was absent. Diagnoses were: (1) choleothasis, (2) history of hysterectomy, (3) incompletely distended rectum and sigmoid colon. Tr. 19.

She returned on February 17, 1997 with continued complaints of severe diarrhea, nausea with swelling. Diagnoses were: (1) irritable bowel syndrome, and (2) GERD. Tr. 18.

### Sylvan Grove Hospital

### Dr. Krishan Gupta, M.D.

She visited the Sylvan Grove Hospital on September 18 and 19, 1995, with complaints of flu-like symptoms—throat, spreading rash and itching and ? numbness. Her physical examination was essentially normal, rule out allergies, and was released by Dr. Maldonado. Tr. 835–840, 1122–25.

On February 23, 1996, the claimant went to the Sylvan Grove Hospital Emergency Room with complaints of flu-like symptoms. Her physical examination was essentially normal and she was released by Dr. ? to return home. Tr. 832–834, 1119–1121.

On March 27, 1997, Dr. Vicky James, M.D., referred the claimant to Dr. Krishan Gupta, M.D. because of her stress urinary incontinence, which is aggravated by her low back pain. Dr. Gupta examined the claimant and his diagnoses were (1) stress urinary incontinence, (2) status post-hysterectomy, (3) chronic back problem, and

(4) exogenous obesity. He also noted in her past medical history that she had stopped drinking one year previously. Tr. 17. On April 3, 1997, he admitted her to the Sylvan Grove Hospital where he performed a lysroscopy, calibration and dilation of her urethra and Marshall–Marchetti procedure as an outpatient. Tr. 16. She returned to the hospital on May 15, 1997 for apparently another outpatient Marshall–Marchetti procedure (M–M). Tr. 14–15, 331–31, 1127–29. She returned again and was admitted on May 20, 1997, and underwent another "M–M" procedure on May 22, 1997. She was discharged on May 24, 1997. Post-operative diagnosis was: (1) stress urinary incontinence, (2) mild to moderate cystoure throcele. Tr. 11–13, 812–22.

On May 29, 1997, Dr. Gupta notified Dr. James that the claimant was (1) post Marshall–Marchetti procedure, (2) low back ache, and (3) cystociles, and was making a good recovery. Tr. 10, 829. She returned on May 30, 1997 with complaints of urinary hesitancy and had her foley catheter replaced. Tr. 826–28, 1116–18. She returned on June 5, 1997, and Dr. Gupta removed her foley catheter. Tr. 9. On June 8, 1997, he had to reinsert the foley catheter. Tr. 823–26, 1102–04. A 6/13/97 follow-up visit noted good progress. Tr. 8.

### Dr. Vicki James, M.D.

From October 24, 1996 through June 30, 1997, the claimant was treated by Dr. Vicki James, M.D. for hypertension and GI distress. Tr. 840–850. On examination, she found: (1) hypertension with good control, (2) history of hiatal hernia and gastric reflux. She returned on November 21, 1996 and was also diagnosed with gastritis. She returned again on December 4, 1996, and was also diagnosed with (1) irritable

bowel syndrome, (2) depression, and (3) seasonal rhinitis. Tr. 849. She returned on January 10, 1997 with multiple complaints, including syncope, atypical chest pain, conjunctivitis and right elbow pain. Her physical examination was essentially normal. Diagnoses were: (1) syncope with angina, (2) conjunctivitis, and (3) right epicondyditis. Tr. 848. She returned on February 11, 1997, complaining of post-nasal drainage, headaches and right elbow pain. Examination was essentially normal. Diagnosis was sinusitis. (*Id.*). She returned again on February 28, 1997 after being evaluated by Dr. Jalil, who told her she had a hiatal hernia. She reported that she was still having severe nausea and vomiting, which also causes urinary incontinence. She also has anterior chest wall pain. Her examination was essentially normal. Diagnoses were: (1) urinary stress incontinence, (2) hiatal hernia, (3) costochorondrias, (4) irritable bowel syndrome. Tr. 847. She returned on February 11, 1997, complaining of post-nasal drainage, headaches ?, a burning pain in her right elbow. On examination, Dr. James noted tenderness to palpation of the sinuses, more on left, mild injection of the posterior, pharynx and cervical adenopathy. Diagnosis was sinusitis. Tr. 848. She returned on March 25, 1997 after having been involved in a motor vehicle accident and diagnosed with muscle strain. Since then, she has been suffering with low back pain. On examination, Dr. James noted tenderness to palpation with no spasms. Diagnosis was acute exacerbation of chronic lumbar disease. Tr. 845. She returned again on April 8, 1997, reporting the pain was better, but with tightness in low back muscles. On examination, James observed spasm or tenderness to palpation. Tr. 844.

On May 2, 1997, she returned with a number of complaints: stomach pain and irritation, chronic diarrhea. The examination was essentially normal. Diagnosis was hypertension under control. Tr. 841.

A June 10, 1997 visit included complaints of low back pain, possibly exacerbated by bladder surgery by Dr. Gupta. On examination, James noted: abdomen— 3 bs, soft mildly exudes, UQ back, decreased ROM ⊕ bilateral sacroiliac tenderness ⊕ L straight leg raise. Diagnoses were acute exacerbation, chronic low back pain. *Id.* On her June 30, 1997 visit, the claimant reported that her back was better, but she had to stop taking Reglan because it made her too depressed to care for her children. Another physician told her she had gallstones. The examination was essentially normal. Diagnoses were: (1) degenerative joint disease, osteoarthritis of the spine. Tr. 340.

*Spalding Regional Hospital*

On March 19, 1997, the claimant was seen in the Spalding Regional Hospital Emergency Room with complaints of pain in her tail bone, apparently after a motor vehicle collision. She also complained of a head injury, (-) hn disc, ⊕ chronic lower back pain, more on left, ? H/O ? 1992, S/P laminectomy L5–S1, ?. She complained of tenderness and decreased range of motion lower left extremities. Diagnosis was muscular ? pain, H/O chronic LBP. Degenerative disc disease (physician's signature illegible). Dr. Anthony Ferrara, M.D. Tr. 911, 1022.

On April 28, 1998, the claimant again visited the Spalding Regional Hospital with complaints of trembling and leg weakness. She also complained of chronic low back pain, weak neck, muscle weakness. On examination by Dr. H. Michael Webb, M.D. and Dr. Ronald C. Gay, M.D., which

are mostly illegible, show her cranial nerves II—XII were intact, heart-RRR, abdomen—⊕ bowel sounds, soft, tender normal, (-) CUH tenderness, no edema ROM fall. PTRS 2 ⊕, pulse palatable? diagnosis was neuropathy: X-rays of her lumbar-sacral spine showed mild osteoporosis, vertebral body height and disc spaces are well maintained without fracture or subluxation. Mild spondylosis about the L5 vertebral body, otherwise normal. Tr. 908–10, 1020–21.

On June 17, 1999, the claimant visited gastroenterologist Dr. Appaswamy M. Gowda, M.D. with complaints of diarrhea, abdominal pain, nausea and vomiting. Dr. Gowda noted her past medical history and examined her, finding "no jaundice, neck supple, lungs clear, heart sound heard, abdomen soft, diffused moderate tenderness, no mass, no rebound, normal rectal exam with positive occult blood and normal extremities." Diagnostic impression was abdominal pain, diarrhea, IBD, IBS, PhD, hernia w/reflux, obesity, and hypertension. Tr. 1170.

On June 18, 1999, he admitted her to the Spalding Regional Hospital for several procedures. A colonoscopy disclosed internal hemorrhoids and no polyps or constricting lesion. Tr. 1168. He readmitted her on June 23, 1999. At that time, a gallbladder ultrasound revealed that the gallbladder was partially obstructed and filled with multiple gallstones, no dilated bile ducts, otherwise unremarkable. Tr. 1165–67. She also had moderate to severe abdominal tenderness with no masses. Final diagnoses were: (1) abdominal pain, intermittent diarrhea, (3) hypertension, (4) depression, and (5) cholelithiasis. She was discharged on 6/25/99. Tr. 1165–67. During the admission, he also had her examined by Dr. Kusuma S. Rao, M.D., apparently a psychiatrist. He determined that

she was alert and oriented X four. She was cooperative, but extremely anxious, nervous and depressed with severe signs of neurovegatitive signs of depression and insomnia, an inability to concentrate, easy irritability and severe panic attack. She exhibited fear of the unknown and feelings of unreality. No auditory or visual hallucinations. She also denied suicidal or homicidal ideations. Her memory was clouded due to her anxiety; her judgment was questionable, but no evidence of any psychosis. Diagnoses were:

> AXIS I: depression, severe in nature, without psychotic features, questionable bipolar disorder.
>
> AXIS II: deferred.
>
> AXIS III: 1. cholelithiasis, 2. peptic ulcer disease, 3. high blood pressure, and 4. obesity. Tr. 1163–64, 1174–75.

Apparently, the record also contains Dr. Gowda's mostly illegible office notes from 6/22/99, 7/16/99, 8/13/99, 10/19/99, 10/29/99. Tr. 1161–62.

On June 14, 2002, she returned to the Spalding Regional Hospital where Dr. David A. Van, M.D. had PA and lateral X-rays of her chest made. Diagnosis was possible infiltrate in the right base arterially, manifested by loss of sharpness in the left hemidiaphram. Tr. 1178. Thereafter, on June 18, 2002, she also underwent an echocardiogram. Results were difficult to study: (1) the left ventricle was normal?, with mild LVH & preserved 1–V function (ff inq), (2) the AD, RD, RV were normal, (3) the valves were not well visualized, and (4) there is no pericardial effusion. Tr. 1178.

*IRIS Counseling Alliance*

From June 23, 1999 through February 28, 2001, the claimant was treated at the IRIS Counseling Alliance. Tr. 1171–95.

The August 3, 1999 visit noted that the claimant was complaining of multiple problems and had been denied Social Security

Disability Benefits. Assessment was mostly illegible, but apparently states that her medications are too high, and the plan was to reduce them? The October 19, 1999 entry notes that the claimant had improved because of an improved family situation. Tr. 1173. On January 15, 2001, the claimant underwent a mental status examination. At that time, she was irritable, sensitive and withdrawn; her facial expression was sad and worried; her appearance was "fat" and poor clothing; motor behavior was decreased; speech was less than normal; her mood and affect were anxious and depressed; sensorillem: memory intact; content of thought was suspicious, feel persecuted, and ideas of guilt. None of which was caused by drinking or withdrawing; her flow of thought was blocking; her fund of information was adequate; her judgment was poor; her intelligence was average; her reliability was truthful; her physical condition noted difficulty falling asleep. There was no alcohol or drug abuse. Diagnoses were:

AXIS I: major depressive disorder;

AXIS II: deferred;

AXIS III: class four?;

AXIS IV: ? and

AXIS V: 60 (doctor's signature illegible).

Tr. 1171–72. The entry of February 28, 2001 is mostly illegible but appears to state that the claimant is suffering from dysthemia deficit—needs ?; prefers to ? of new group ? She was also referred to neurology. Doctor's signature is illegible. Tr. 1171. Indeed AA is ideal(?) ? Interview is adequate.

*McIntosh Trail Family Practice*

*Dr. David Van, M.D.*

*Dr. Vickie Van, M.D.*

*Emory Clinic*

Apparently, commencing in February, 2002, the claimant was treated by Drs. Vickie and David Van and Laura Trice, FNP, at the McIntosh Trail Family Practice. Tr. 1139–1153. On February 16, 2000, she had a pap smear with normal result. Tr. 1151–53. On May 24, 2000, she was treated for a cyst in her groin area. Tr. 1150. She returned on May 26, 2000 with complaints of vomiting, a sore throat, and nausea. Diagnosis was rule out ulcerative colitis, and Barrett's esophygosis. Her cyst was also improving. Tr. 1146–49. She returned again on June 14, 2000 for a physical examination and a check up on her high blood pressure, and Type II diabetes. It was also noted that she had a 2 + pedal pulse on her feet, and her EKG was normal. Diagnoses were: (1) uncontrolled Type II diabetes, (2) seizure disorder, (3) obesity, (4) hypertension, well controlled, and (5) history of dyspepsia. Tr. 1139–45. She was also referred to Dr. Page B. Pennell, M.D. at the Emory Clinic, as a consequence. She also underwent an electroencephalogram at the Emory Clinic neurodiagnostic lab by Dr. Charles Epstein, M.D. Results were normal. Tr. 1142. She also had an MRI of her brain and C-spine because of a history of seizures, paralysis and neck fractures. Evaluation by Dr. Arthur Fountain, M.D. noted (1) inferior right temporal lobe encephalomalaer unchanged from March 2000 CT, (2) abnormal increased T2–weighted signal within the bilateral hippocampal formation; (3) minimal multi-level cervical spine spondylosis without significant central spine stenosis.

Evaluation of the bony structures on the MRI is limited by patient movement. Tr. 1143–44. On June 5, 2000, Dr. Pennell, assisted by Dr. John S. Thomas, M.D., neurophysiology fellow, notified Dr. Vickie Van that the claimant's past medical history included two types of events. The first was in April, 1997 when she underwent

rapid right-sided facial numbness followed by four extremity paralysis. This resulted in a two-week hospitalization, Grady Memorial Hospital. The second occurred in February, 2000 when she experienced facial numbness followed by upper body paralysis, followed by shaking, trembling of an extremity which was corroborated by her husband.

Pennell reported that she had undergone an MRI of her C-spine, which he had not yet reviewed, and an EEG. She also suffers from depression and participated in adult day care activity through GMH which helps her depression.

Neurologically, he observed that the client's mental status is notable because she gave child-like responses. She is very tangential and reports somatic symptoms quite frequently. Her memory and language functions were intact. Cranial and nerve exam were normal; normal facial activation, sensational symmetry; hearing is symmetric; tongue and palate in midline; motor exam is 5 out of 5; strength in extremities with normal bulk and tone; deep tendon reflexes are 2 plus and symmetric with flexor plantar responses; coordination is slow but intact to finger to nose; rapid alternating movements are slow and accompanied by extraneous movements around more paroxysiual joints with rapid finger movements or side-patting; sensory examination is intact to primary mobility testing; Romberg sign on standing; casual gait is normal; tendon gait shows marked eversion of the left foot. His assessment was— an essentially normal neurological exam; her events are most consistent with psychogenic albeit rule out intermittent myelopathy due to compressive disease since she has cervical disc disease. He recommended that she undergo (1) MRI of brain and cervical

spine, (2) EEG, and (3) follow up GMH records. Tr. 1132–33, 1134–38.

### The Consultative Evaluations

The claimant also underwent several consultive medical and mental examinations to wit: Dr. G.N. Kini, M.D., on August 22, 1995 (Tr. 408–413), Dr. Dick Maverhofer, PhD. on August 12, 1995 (Tr. 414–423), Dr. W. Jay Clark, PhD. on January 5, 1998 (Tr. 859–863) and Dr. Robert T. Shephard, PhD. on October 5, 1998 (Tr. 960–68).

Non-examining state physicians and psychologists also gave opinions on whether the claimant was disabled, to wit: Dr. Allen Carter, PhD. on August 22, 1995 (Tr. 424–433), Dr. John W. Hollender, PhD. on January 14, 1998 (Tr. 864–875); Dr. K. Esna–Ashari, M.D. on January 16, 1998 (Tr. 878–885); Dr. Phillip E. Gertler, M.D. on March 9, 1998 (Tr. 886–93); Dr. Robert T. Coyle, PhD. (Tr. 894–907).

### Dr. G.N. Kini, M.D.

As previously noted, on August 22, 1995, Dr. G.N. Kini of the Conyers Medical Clinic, conducted a consultative physical evaluation of the claimant. (Tr. 408–13). He determined the claimant was alert and oriented, furnished a good past medical history, and appeared reliable and competent. She was well groomed and did not appear overly anxious or depressed. Her head, eyes, ears, nose, throat, neck, chest and heart were normal. Her abdomen was obese and mildly tender, no mass or hernia seen. Her back showed a prior laminectomy scar; spinal servitors were normal, diffuse tenderness in the scapular and gluteal muscles consistent with fibromyalgia; straight leg raising was 90° on right, 45° on left; deep tendon reflexes were sluggish,

but symmetrical. The claimant also complained of hyperesthesia in her extremities, which did not follow any dermatomal distributin pattern. Extremities showed no edema, clubbing cyanosis or varicosities; all pulses were normal; range of motion normal in all joints; grip strength, coordination, gait and power were normal. X-rays of her lumbar spine showed that the lumbar vertebral bodies and intervertebral disc spaces from L1–L4 were normal, L4–5 and L5–S1 space were diminished and sclerotic with straightening of the lumbar lordosis suggesting muscle spasms. His diagnostic impression was L4–5–S1 degenerative disc disease with muscle spasm. Diagnoses were (1) chronic anxiety neurosis and depression, (2) chronic back pain with degenerative disc disease, (3) fibromyalgia, (4) hypertension—controlled, (5) reflux esophagitis by history, and (6) irritable bowel syndrome. He opined that the claimant had multiple problems, mostly related to her anxiety and depression. Her blood pressure, back problems and hernia were not disabling based on medical records. He also opined that with aggressive psychotherapy and pharmacotherapy, she could resume gainful employment as soon as she shows signs of improvement of her anxiety and depression induced somatic symptoms. He also prepared a medical assessment of her physical ability to perform work-related activities, to wit:

I. no lifting, carrying impairments,

II. no standing/walking impairments,

III. no sitting impairments,

IV. as to postural impairments, she could climb, balance and stoop frequently; crouch, kneel and crawl occasionally. She had no physical function limitations,

V. or environmental limitations.

### Dr. Dick Maverhofer, PhD.

On August 16, 1995, Dr. Dick Maverhofer, PhD. performed a psychological evaluation. Tr. 414–23. Her grooming and hygiene were fair; she was overweight, walked without difficulty, could also use her arms and hands normally. She was also able to sit for the evaluation without difficulty. She was cooperative and interacted in an alert, tense and apprehensive manner. Her speech was adequate, comments were relevant, but rather immature. She also exhibited anxiety and depression primarily related to family problems and stress. She was not suicidal or homicidal; no psychotic symptoms such as delusions or hallucinations were noted; contact with reality was good with no bizarre behavior; no confusion in her thinking; stream of thought was adequate, and thought content appropriate. Her intellectual and orientation skills were good; adequate social judgment, but with limited insight; no difficulty with current or background information.

She advised that medically she had two herniated discs, a lot of ankle pain, numb on left side. She has had several surgeries including appendix removal, sinus surgery, a hysterectomy, GI surgery and back surgery. She was last hospitalized in November, 1994 for three days at the Georgia Regional Hospital to regulate her medications and appeared suicidal. When she uses alcohol and her medications, she gets depressed and upset. She was also attending the Butts County Mental Health Clinic twice a month, and will begin the day treatment program. She also complained of mental exhaustion from family problems. She was 90% correct when answering questions about people, time and place. She rarely traveled. Her daily activities included doing the laundry, cook-

ing, cleaning up, a little TV and local driving, about 10–20 miles a week, she grocery shops and does other shopping. She doesn't nap, do exercise, knit, crochet, do yard work or take care of pets; rarely reads because of eye problems; she also does some mending; she is able to sleep at night. She doesn't visit friends, relative, or neighbors, nor does she go to church. Because of hearing problems, she doesn't make phone calls, nor does she listen to music. She has no hobbies, but occasionally plays games with her children. She does no gardening or taking care of flowers or plants. Most of her time is spent parenting her children. She relates to others in a limited manner and tends to be anxious and depressed. She has family problems from her husband's drinking and the return home of two of her children. She takes care of her grooming and hygiene, and her daily interests and activities are mildly to moderately limited. Tr. 416.

On the Wechsler Adult Intelligence Scale—revised, she has a verbal IQ of 90, performance scale of 89, and a full scale IQ of 89, which places her in the average intellectual area. She can understand directions and work without supervision with good quality, albeit slow. She was not aware of details in her environment, but could think through tasks sequentially and deal with abstract reasoning. Her short and long-term memory skills, vocabulary and math skills were appropriate. She exhibited no evidence of any specific cognitive problems or organic dysfunctioning.

On the Wide Range Achievement Test–3, she reads at the high school level (93), spelling and arithmetic at fourth grade level (69) and (68), an average standard score of 77, which was the borderline achievement area.

On Perceptual Motor Testing, she was given the Memory of Designs Test (MDT). She had trouble drawing some of the designs directly with problems concentrating. She worked in an organized manner and remembered the general outlines of designs, but distorted three of the drawings and omitted details, with no reversals or rotations, and did not persevere in her work. There was no evidence of organic dysfunctioning, albeit with difficulty focusing her attention because of anxiety. Tr. 418.

She has adequate cognitive skills to manage her work and interacts appropriately with others, although she is somewhat immature. However, she has problems with anxiety and depression.

If her husband stopped drinking and her two sons adjusted adequately, she could manage her problems.

The diagnoses were:

AXIS I: 301.13, cyclothmic disorder,

AXIS II: 301.9, personality disorder, NOS,

AXIS III: obesity, back pain, and ankle pain.

His prognosis was that she was limited for sustained employment. Tr. 419–423.

### Dr. W. Jay Clark, PhD.

Dr. W. Jay Clark, PhD. evaluated the claimant on December 19, 1997. She appeared neatly dressed, tense and anxious. She was cooperative and appeared to be doing her best coping with the evaluation, although she had both hearing and visual problems. This slowed the pace of the interview and required repetition many times. Speech was faint and had to be asked to repeat her answers. Her thought processes seemed confused at times; her short term memory was poor, and her long

term memory unreliable. Physically, she has disc deterioration in the L3–S1 area with prior surgery at L5–S1. She can't climb steps, touch her toes or run. She also had surgery in 1993; and in the summer of 1997, bladder surgery for incontinence. She also has a chlamydia infection in her throat and trouble with acid reflux.

In the late fall of 1993, she developed depression, high blood pressure, and acid reflux disease. She also had an irritable bowel syndrome. She also has anxiety and panic attacks. She also has a hiatal hernia. She had her first psychiatric treatment in June, 1997 from Dr. Beal. She was also treated for depression and suicidal thoughts until November, 1995 at Southside Mental Health Center, then at Georgia Regional Hospital for three days. She is now being treated at Grady Memorial Hospital which includes daily group treatment. She attends six different Grady clinics. Tr. 860.

Her daily living activities are spent visiting doctors in clinics or staying at home sick. She is about to lose her parental rights because she is unable to take care of her children. Tr. 861.

On the WRAT–3, she read at the seventh grade level, and performed arithmetic at the fourth grade level. Tr. 861.

Her drawing of a person was typical of drawings by persons in the 80 IQ level. Tr. 862.

She lives in a personal care home, feels she is seriously ill and getting worse. Her prognosis is poor, and has not profited from her therapy. She has the following work-related problems:

A. Understanding and remembering instructions were not observed, but her work history shows that she has difficulty understanding and carrying out instructions to her employer's satisfaction.

B. Sustaining concentration and task persistence: not observed, but she has a marked tendency to become lost in rumination concerning her ills, anxieties and insecurities, and loses touch with the activities going on.

C. Social interaction in the work setting. The claimant is not presently work ready. She will not do well in a job situation where she has to adapt to changes. If she works, it must be very simple, stable job situation with adequate supervision.

Diagnoses were:

AXIS I: Code 300.81—somatization disorder Code 296.33—major depressive disorder, recurrent, severe

AXIS II: Code 799.9—deferred diagnosis

AXIS III: history of multiple physical disorders plus lower back injury.

Tr. 863.

*Dr. Robert T. Shephard, PhD.*

Dr. Robert T. Shephard, PhD. evaluated the claimant on October 5, 1998. Tr. 960–968. General observation included difficult relationship with her husband, difficulty hearing which required the repetition of questions and demonstrations. She did not appear psychotic or demented.

On the WAIS–R, her verbal IQ was 87, performance IQ 88, full-scale IQ 87—low average.

On the WRAT–3, she read at the 8th grade level, spelled at the 5th grade level and performed arithmetic at the 4th grade level. Scores respectively were 81, 73 and 71.

The Bender–Gestalt Test were within normal limits with nothing suggesting organic brain impairment.

The Personality Evaluation indicated intellectually low-average, with basic reading at the 8th grade level. Spelling and arithmetic have atrophied from lack of practice in recent years. She stopped driving a car two years ago, although she still has a license. She does some light cooking and makes cold snacks, but burns food. She can wash dishes and do laundry, does the housecleaning, goes grocery shopping with her husband and can make small change. She has difficulty sleeping—only two to three hours off and on, with occasional afternoon naps. She sits most of the day, and is unable to stand for very long. In fact, she does most of her household chores while sitting. She occasionally reads the Bible and novels, watches some TV and listens to the radio. Her three children do not live with her. Tr. 962.

She does not visit friends, nor do people visit her. She can perform simple sewing. She can no longer crochet. Every couple of months, she visits family members in Columbus. She doesn't participate in sports, but likes to get into a pool. She tries to avoid talking on the telephone. She doesn't do repair work or anything artistic. She doesn't participate in games. She purchases clothing at a thrift store. Her hobby is "doing crafts." She also walks to the mailbox. She stays home all the time. Her husband takes her to a fast food restaurant on Friday nights. She doesn't go to the movies because the sound hurts her ears.

Because her husband is an alcoholic, they rarely do things together which also causes home disturbances. She also had behavior problems with her children. She doesn't relate to neighbors, but can get along with them on a short-term basis when necessary. She is unable to physically and emotionally manage friendships. She does her own hair and bathes daily. She also dresses daily unless she is feeling bad and stays in bed. Tr. 962.

She has not had a psychiatric crisis requiring involuntary hospitalization or other major psychiatric approach.

There is no evidence of organic brain damage, but she has serious problems with peripheral psychomotor functioning. She has poor control of her hands in constructional activities. She also complains of numbness, strange skin sensations, loss of feeling in parts of her body, tremors and shakiness, and problems dropping things. She has memory difficulty and difficulty with common sense; also impulse control including controlling her temper and emotions. She also has sensory difficulties involving impaired hearing, blurred vision, including double vision. She also faints under stress, and loses contact with the passage of time and incorrectly estimates a sequence of events, probably related to her high anxiety rather than cerebral impairment. Likewise, her sensory efficiency could have caused some of her other problems, and her anxiety is a strong contributing factor, and she lacks basic defense functions. When placed under stress, she decompensates including withdrawal, loss of impulse control, detachment from her physical surroundings and control. Tr. 963.

She is a passive-dependent individual and gets constantly distressed over unanticipated events, including panic attacks or intense anxiety. *Id.*

Because of her real problems, she will be difficult to treat. *Id.*

Diagnoses were:

AXIS I: Generalized anxiety disorder, severe. # 300.02 (possible) panic disorder without agoraphobia (# 300.01),

AXIS II: No diagnosis.

Tr. 964.

I. Her ability to make occupational adjustments is seriously limited in following work rules, dealing with the public, interacting with supervisors, dealing with ordinary work stresses, functioning independently and maintaining attention and concentration, and limited in relating to co-workers and using judgments. Tr. 965.

II. Making performance adjustments, no useful function in understanding, remembering and carrying out complex job instructions, seriously limited in understanding, remembering and carrying out detailed job instructions and limited but satisfactory in understanding, remembering and carrying out simple job instructions. Tr. 966.

III. Making personal—social adjustments/cognitive control and preoccupation with all of her physical symptoms; limited, but satisfactory in maintaining personal appearances, relating predictably in social situations, and demonstrating reliability, and seriously limited in behaving in an emotionally stable manner. Tr. 966.

Likewise, her ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform in a consistent pace is seriously limited.

Her ability to interact appropriately with the public, ask simple questions or request assistance, get along with co-workers, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation and setting realistic coals and making plans was moderately limited. Her ability to accept instructions and respond appropriately was also markedly limited, as was her ability to respond appropriately to changes in the work setting. Tr. 968.

*Dr. Allen Carter, PhD.*

Dr. Allen Carter, PhD., apparently a non-examining psychologist, evaluated the claimant's records on August 22, 1995. He noted that a residual functional capacity assessment was necessary because she had a severe disorder that did not meet or equal a listed impairment: she had an affective disorder ( § 12.04) and a personality disorder ( § 12.08). He noted that the claimant had a history of low back pain and ? depression ?. As to Appendix 1, § 12.04, she had disturbance of mood, accompanied by a full or manic or depressive syndrome as evidenced by at least one of the following: depression NOS. As to her personality disorder, § 12.08, she had inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, as evidenced by at least one of the following—# 7. P.D. NOS. He further noted that there was no evidence that she was suffering from a somatoform disorder (§ 12.07) or a substance addiction disorder (§ 12.09). As to the severity of her impairment: 1. restriction of daily activity was slight; 2. no difficulty in maintaining social functioning, but she often had 3. deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere), and 4. had one or two episodes of deterioration or decompensation in work or work like set-

tings which caused the individual to withdraw from the situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behavior). Tr. 424–433.

### Dr. John W. Hollender, PhD.

On January 14, 1998, Dr. John W. Hollender, PhD., a non-examining psychologist, prepared a psychological evaluation of the claimant. Tr. 864–885. He reported that the claimant required a residual functional capacities assessment as she had a severe impairment that does not meet or equal a listed impairment, to wit: an affective disorder (§ 12.04) (i.e. a somatization disorder, major depression, and dysthemia). Specifically, under "Appendix 1, C". § 12.04, she had disturbance of mood, accompanied by a full or partial manic or depressive syndrome as evidenced by at least one of the following B ... No. 4. Depression, somatization disorder. Ironically, he did not mark that she did not have a § 12.07 somatoform disorder. He also noted only a slight restriction of the activities of daily living, moderate restrictions in maintaining social functions and deficiencies of concentration, persistence or pace resulting in failure to timely complete tasks; and no episodes or deterioration or decompensation in work settings. On the mental capacity assessment, he stated she had no limitations in A. 1 remembering locations and work-like procedures, understand, remember and carry out simple instructions, B. 4 carry out very short and simple instructions, 7. perform activities within a schedule, maintain regular attendance and be punctual, 8. sustain ordinary routine without special supervision, 9. work in coordination with or proximity to others without distraction, 10. make simple work-related decisions, C. 13 ask simple questions, 14.

appropriately accept instructions, D. Adaptations (no limitations); moderately limited in A(3) understanding and remembering detailed instructions, B(5) carrying out detailed instructions, (6) maintain attention and concentration for extended periods, 11. complete a normal workday and work week without interruption; Court 12. interact appropriately with the general public, 15. get along with co-workers. Tr. 864–77.

### Dr. K. Esna–Ashari, M.D.

A non-examining DDS physician, Dr. Esna–Ashari, M.D., evaluated the claimant's work abilities based on her medical records, on January 16, 1998. Tr. 878–85. She noted that the claimant suffered from degenerative joint disc (DJD) and degenerative disc disease (DDD), lower spine and cervical spondylosis. She opined the claimant could lift 50 lbs. occasionally, 25 lbs. frequently; stand/walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, and had no push/pull limitations; she had no "C" manipulative, E. communicative, or F. environmental limitations. She had D. visual limitations with both near and far acuity; and B. postural limitations: only occasionally climbing and stooping.

### Dr. Philip E. Gertler, M.D.

Another non-examining, DDS physician evaluated the claimant's residual functional capacities assessment on March 9, 1998 (Tr. 886–893). His findings matched Dr. Esna–Ashari's findings.

### Dr. Robert T. Coyle, M.D.

Another non-examining DDS psychologist, Dr. Robert T. Coyle, PhD., also prepared a psychological review on March 10,

1998. Tr. 904–07. He, too, found the necessity for a residual functional capacities evaluation. He also noted that the claimant suffered from 1(B)(3) § 12.04 affective disorder, (5) § 12.06 anxiety disorders, and (6) § 12.07 somatoform disorder. As to § 12.04, she suffered from depression; as to § 12.06, she suffered from anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by # 6 (other) illegible; as to § 12.07, she had physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms as exhibited by (3) an unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury; and 4. somatization disorder. Her impairment severity was listed as a slight restriction of daily activities, moderate restriction in 2. maintaining social functioning, 3. often had deficiencies of concentration, persistence or pace resulting in a failure to timely complete tasks, but 4. she had never experienced episodes of deterioration or decompensation in a work setting. Tr. 301. He further completed a mental residual functional capacities assessment, indicating A. *Understanding and Memory.* She had no significant limitations in (1) remembering location and work procedures, and (2) understanding and remembering very short and simple instruction, B. *Sustained Concentration and Persistence.* (1) carrying out short and simple instructions, (8) sustaining an ordinary routine without special supervision, (9) working in coordination and proximity of others without distraction, (10) making simple work-related decisions, C. *Social Interaction.* (13) asking simple questions, (14) accepting instruction and criticism, (16) maintaining sociably appropriate behavior, D. *Adaptation.* (17) responding appropriately to workplace changes, (18) being aware of normal hazards and taking precautions, (19) traveling in unfamiliar places and using public transportation.

She was also moderately limited in B(5) carrying out detailed instructions, (6) maintaining attention and concentration for extended periods, and (7) performing activities within a schedule, maintaining regular attention, (11) completing a normal workday and work week without interruption from psychologically based symptoms, and D(20) setting realistic goals and plans. Tr. 904–05.

He also acknowledged that his findings differed from a treating source. Tr. 906.

## THE SUBJECTIVE EVIDENCE OF DISABILITY

The claimant's subjective evidence consists of her statements in support of her application and her testimony at the (1) November 6, 1996 hearing before ALJ Robert L. O'Steen, Jr. (Tr. 59–116), and her testimony at the (2) January 25, 1999 (Tr. 531–584) and (3) the May 14, 2001 (Tr. 585–625) hearings before ALJ James E. Deen, Jr. ALJ Deen reviewed her testimony at the 1995 hearing (Tr. 484–85), as well as the two hearings before him (Tr. 435).

### The January 25, 1999 Hearing

At the first hearing, the claimant, who was born on July 15, 1957 and graduated from high school, testified about her past work history as a cook, clean up and cashier in 1991 at a McDonald's fast food restaurant, (Tr. 74), as a part-time assistant to a nurses' aide at the Toccoa Nursing Home (12/87 through 4/88) *Id.,* as a motel maid (Tr. 76) and as an inspector in a shirt factory (Tr. 76).

She said that she had been disabled since January 15, 1993 from high blood

pressure and because of a bad back, including a back operation, and pain. Tr. 81–82. And, as of the hearing, was being treated therefor at Grady Memorial Hospital's Orthopedic Clinic. Tr. 84–85. She has degenerative disc disease, and is unable to do any exercise other than water aerobics three times a week. Tr. 86, 89. She has also been treated by a chiropractor and physicians for her bad back, which causes numbness, burning and tingling. She also had a drinking problem beginning in 1992, drinking one or two beers nightly. Indeed, it got bad in 1993. Tr. 80–81. She has, however, been alcohol free since October, 1994. Tr. 103, 105–06.

Although she has a driver's license, she rarely drives because driving longer than one hour causes severe back pain. Tr. 65–67. She does drive to the grocery store with her husband and to doctors' and hospital appointments. Tr. 66. Indeed, such also causes stress. When she goes grocery shopping, her husband has to push the cart. Tr. 67. She has driven to Columbus, Georgia to visit her children and once to Cleveland, Georgia. This long drive required her to be hospitalized at the Georgia Regional Hospital for three days as she was, *inter alia,* throwing up all day. Tr. 70–72.

She also has difficulty walking because of pain in her left side. Tr. 70–71.

She also goes to a group therapy program at GMH, where they talk about alcoholism, and which also includes field trips—shopping, bowling. Tr. 89–90.

Her days are spent going to the water aerobic classes three times a week, and going to doctors' and hospital appointments and the group therapy. *Id.* She also crochets and sews, watches a little TV (1/2 to 1 hour). She also tries to exercise by walking but requires assistance as she has bad equilibrium and falls. Tr. 90–91.

She also has manic attacks and anxiety. Tr. 105. She also suffers from insomnia, nervousness, getting fidgety, and communicating with others. Indeed she breaks out in hives. She also has weakness in her left hip, and left side with nerve damages and muscle spasms in her back. Tr. 104–05. She also injured her foot at McDonald's; and has had a nerve block test. Tr. 105.

She also washes dishes, prepares one meal daily, and does the family laundry. Tr. 91–93. She also makes up her orthopedic bed. Tr. 93–94. She is unable to go to church because of the hard benches, she doesn't visit people, and people don't visit her.

### The January 25, 1999 Hearing

At the time of the January 25, 1999 hearing, the claimant was 41 years old. Tr. 536. She also acknowledged that she became disabled on April 2, 1994 and is a high school graduate. Tr. 537. She also testified she has vision problems which make reading difficult. She is 5' 7" and weighs 230 lbs., and is right handed. Tr. 537–539, 551. She also has hearing problems and usually wears a hearing aid. Tr. 551–52. Since April, 1998, she has developed trembling in her hand—— coordination problems. Tr. 539, 558. She also described her former employment as a fast food worker, which required her to lift less than 20 lbs., and stand and walk for her entire 8–hour shift except for lunch breaks; as a full-time motel maid, cleaning motel rooms for her 8–hour shift, and lifting up to 20 lbs.; as a full-time shirt inspector for her 8–hour shift, and lifted up to 25 lbs.; as a deli cook and server for

her 7–hour shift, and lifted about 20 lbs.; as a packer in a chicken processing plant, packing and cutting up chickens for her 8–hour shift and lifted about 10 lbs.; and as a full-time nurses' aide and spent her 8–hour shift standing and walking. Tr. 533–549.

She also testified that she suffered from arthritis which caused pain in her neck and lower back. Tr. 500. She has severe chest pains which started in January, 1994, which make her go to hospital emergency rooms. Tr. 552. She also has high blood pressure which is under control. Tr. 552–53. She still has a hiatal hernia, which causes pain, difficulty swallowing and muscle spasms. Tr. 553.

She still suffers from degenerative disc disease, which causes lower back pain. Tr. 553–554. Indeed, she says that disc C–6 is broken, and has even undergone back surgery therefor; and it has gotten worse since April, 1998. This makes her stay off her feet, lie down, and take pain medication, but that causes side effect problems—headaches, muscle spasms and nausea. Tr. 553–54. As a consequence, the doctor took her off of the medication. She also suffered a foot injury and had to undergo a foot operation the previous October (i.e.neuroma). Tr. 561

She also suffers from depression and anxiety and has been taking anti-depressants and was participating in group therapy counseling from 1994 through 1998. Tr. 555–56. She has only been hospitalized once—from November 17 through November 21, 1995, when she had a severe panic attack and felt suicidal. Tr. 557. When she gets a panic attack, she gets scared and this causes her to isolate herself and go to bed. She gets the panic attacks daily, which last for 3 to 4 hours. Tr. 568–69. She also hyperventilates. *Id.*

She also has a problem with comprehension. Tr. 557–58.

Her daily activities consist of getting up, getting dressed, fixing breakfast, listening to the radio. She also washes her dishes, and does a couple of loads of laundry, but is bothered by pain, which causes her to have to lie down. She suffers from pain in her back, legs, and chest, and has sharp headaches, which last for hours, and nausea, which incapacitates her for several days at a time. Tr. 559, 567, 570. In the afternoon, she fixes supper for her husband and herself. She also occasionally watches TV. She doesn't make lunch, and does no yard work. Tr. 559–61. She occasionally drives to the grocery store, but requires her husband's assistance. Tr. 561–62. She has also had difficulty sleeping since 1994 because of anxiety and only sleeps four hours a night. Tr. 562. She can sit up for about 30 minutes, then has to lie down for several hours throughout the day. Tr. 567.

She doesn't otherwise go out of the house except when she was enrolled in daily adult day treatment in September, 1997 through October, 1998. Tr. 562–63. However, in April, 1998, through October, 1998, she could only go twice a week because she had suffered a paralyzation of her lower body and muscular discomfort. Tr. 563.

She has no visitors other than her oldest son during the holidays. Tr. 563. She has some hobbies-crafts-painting, needlework, crochet, but that diminished beginning in April, 1998 because of right hand difficulties. Tr. 563.

She can only stand and walk for two hours during an eight-hour work shift, and could sit for only two hours during an eight-hour shift. Tr. 564. She could not

lift more than 10 lbs. because of pain. *Id.* Neither is she able to perform any of her past jobs. Tr. 565.

She also still suffers from irritable bowel syndrome which causes chronic diarrhea four to six times a day, and pain daily. Tr. 565.

*The May 14, 2001 Hearing (Tr. 585–625)*

For the benefit of the new VE, the ALJ reviewed the claimant's past work history. Tr. 593–596. He then asked if the claimant was suffering from anxiety in 1994 when she was admitted to the Georgia Regional Hospital, and she replied, yes, even earlier. Tr. 596–601. He also asked how long she had had a drinking problem. Tr. 603. She replied, since 1977 until 1992. Tr. 603–04. He then asked what type of problems she had concentrating, and when it began. Tr. 605. She apparently answered when she left McDonald's because her children were being molested by a neighbor, and she had to go into counseling. Tr. 605–06. He asked whether she had difficulty following instructions, and she replied—"on occasion." Tr. 607. He then asked if she had headaches then, and she said "yes." He also asked if she could care for her children, and she replied she was having difficulty, including drinking, and the Welfare Department was called in. Tr. 607–08. She also had TB and high blood pressure, and was required to obtain counseling from Dr. Beal by her caseworker. Tr. 608. She also had her back operation. Tr. 699. Indeed, her physical and emotional problems got worse, and they determined she had a broken neck. Tr. 609–10.

## C. *THE CLAIMANT'S AGE, EDUCATION AND EMPLOYMENT HISTORY*

The claimant was born on July 15, 1957, and was 45 years old when the last ALJ rendered his decision. Tr. 117, 139. She also had prior work experience as a fast food worker, a motel maid, and a nurse's aide. Tr. 47. Prior thereto, the claimant worked as a shirt inspector, frozen chicken processor and another clean-up person. Tr. 710, 718–722. She also worked as a deli cook/slicer. Tr. 544. She is also a high school graduate. *Id.,* 710.

## D. *TESTIMONY OF THE VOCATIONAL EXPERT*

ALJ O'Steen asked Vocational Expert (VE) Vivian Hanna to describe and characterize the claimant's past employment. Ms. Hanna replied that her job as a fast food worker at McDonald's Restaurant was light and unskilled; her job as an assistant nurses' aide was also light and unskilled. Her job as a motel maid was also light and unskilled; and her job as an inspector in a shirt factory was light and unskilled. Tr. 107–08.

He then asked, if the information on Exhibits 30 (the psychological evaluation by psychologist Dick Maierhofer) (Tr. 414–423) and 33 (the Grady Hospital Office notes of July 7, 1995) (Tr. 437) were credible whether the claimant could perform any of her past jobs. Tr. 109. The Vocational Expert answered "Yes." She could perform most light jobs and all sedentary jobs. Tr. 109–11.

He then asked whether the claimant could perform her past work if her testimony was credible, and the Vocational Expert answered "No." Tr. 111–12.

The claimant's attorney then asked whether the claimant could perform such jobs if she had to attend the day treatment program five days a week from 9:00 A.M. to 3:30 P.M. The Vocational Expert answered that such would depend on wheth-

er she could work other shifts. Tr. 112–13.

At the January 25, 1999 hearing, ALJ Deen asked Vocational Expert Dr. Phillip Wierson, to classify the claimant's past work. He replied that her job as a fast food worker was light and skilled, her job as a nurses' aide was medium and semi-skilled, her work as a shirt inspector was light and semi-skilled, her work as a deli cook and slicer was light and semi-skilled; and her work as a poultry processor and packer was light and unskilled. Tr. 572. He also testified that the skills she acquired as a nurses' aid, as a shirt inspector and a deli cook/ slicer were not transferable. Tr. 572.

He then asked the Vocational Expert to assume a hypothetical person between the age of 37 and 41, the same education as claimant's, such person can lift and carry 20 pounds occasionally, and 10 pounds frequently, stand and walk for six hours in an eight-hour workday, sit for two hours a day; do no work that involved climbing a rope, ladder, or scaffold; had moderate, occasional postural limitations in bending, balancing, stooping, kneeling, crouching and crawling; could not work around hazardous machinery or at exposed heights; would have moderate limitations in maintaining attention and concentration for extended periods of time; moderate limitations in carrying out detailed instructions; and moderate limitations in performing work on a schedule. He then asked the Vocational Expert whether such an individual could perform any of the claimant's past work. Tr. 572–73.

The Vocational Expert answered that such an individual could perform the jobs of motel maid, fast food worker, and deli cook/ slicer. Tr. 573.

The ALJ then asked the Vocational Expert to assume the individual had additional limits: could only lift and carry 10 pounds; could only stand and walk for two hours a day, and sit for six hours a day. Tr. 573–74. The Vocational Expert replied that the individual would be limited to sedentary work and could not perform any of the claimant's past work. Tr. 574. The Vocational Expert then identified the sedentary jobs within the individual's capability: (1) food checker, (2) cashier, (3) companion; and that the food checker and cashier were both unskilled. Tr. 574.

If, however, the claimant's testimony was credible, which, *inter alia*, required the individual to lie down for two to three hours, then sit up for 30 minutes to an hour, alternating such, lift less than 10 pounds; have four to six bathroom breaks daily; could only stand and walk for two hours and sit for two hours, the individual could not perform any sedentary unskilled positions; nor could such a person perform any other work. Tr. 574–75.

The claimant's attorney then asked the Vocational Expert to assume that the claimant only had the limitations contained in Exhibit B–8F, Dr. "W. T. Clark's [14]" report, and that the individual was suffering from the medical disorders listed therein (i.e. somatization disorder, and major depressive disorder, recurrent, severe [Tr. 863], the individual reads at the 7th grade level, performs arithmetic at the 4th grade level); ... has serious trouble coping with fairly simple ordinary problems of daily living; a marked tendency to become lost in ? concerning her various ills, anxieties, and insecurities; loses touch with her present activities; has difficulty relating to others in the work place which will continue unless cured with therapy, and is

**14.** Actually, Dr. W. Jay Clark's report (Tr. 859–863).

not work-ready, does not do well in jobs involving changes, and would have to be limited to simple, stable job situations with ample supervision. He then asked whether such an individual could engage in competitive work. Tr. 575–77.

The Vocational Expert replied "No." Tr. 577.

The attorney then asked the Vocational Expert to assume the limitations mentioned by Dr. Robert T. Shephard (i.e. B–17–F [Tr. 960–68] ), which he then enumerated. Tr. 577–79. In answer to whether such an individual could perform competitive work, the Vocational Expert again said, "No." Tr. 577–580.

### The May 14, 2001 Hearing

The ALJ called Alice Gardner as a Vocational Expert at the above hearing. He first asked her to classify the claimant's past jobs. Tr. 611. She indicated: the fast food worker position was light and unskilled; the shirt inspector position was also light and unskilled; the deli cook was light and semi-skilled; the poultry processing was light and unskilled, and the nurses' aide was medium and semi-skilled. Tr. 611–12.

The ALJ then asked the Vocational Expert to assume a hypothetical person with the claimant's education and work history; such person could perform sedentary work including lifting and carrying ten pounds, can stand and walk up to two hours daily and sit six to eight hours daily, occasional slight postural limitation in bending, balancing, stooping, kneeling, crouching and (inaudible) as a result of a back injury. He then asked if such an individual could perform any of the claimant's past jobs. Tr. 612. The Vocational Expert answered, "No." *Id.*

The ALJ then asked the Vocational Expert to assume the individual could perform full-time work on a sustained basis, albeit with certain non-exertional limitations—those identified by Dr. Clark, which he enumerated. Tr. 612–13. She again answered, "No." Tr. 614.

He then asked her to assume the individual could perform sedentary work, albeit with the limitations enumerated by Dr. Maierhofer's 1995 evaluation, as enunciated. Tr. 614–15. The Vocational Expert replied the individual could perform sedentary unskilled work such as a patcher in the home appliance industry, a sorter, and a cuff folder—all sedentary and unskilled. Tr. 615.

The claimant's attorney then asked the Vocational Expert to assume that Dr. Maierhoffer rated her abilities as "fair" on a scale of very good, good, fair (seriously limited but not precluded) and poor (no useful ability). He then asked if such an individual could perform competitive work on a sustained basis.

The Vocational Expert then reviewed the form and replied that it would depend on many variables including attendance and absences, but probably not if she missed three to four days a month. Tr. 617–20. It may, however, be possible. Tr. 624. She also replied that stress would also have a negative impact on the individual's ability to work. Tr. 625.

### PART FIVE DISCUSSION

### A. THE GENERAL RULE

The Commissioner's regulations direct the ALJ to utilize sequential steps in making a disability determination, and permit such a determination to be made at any one of the five steps enumerated therein. 20 C.F.R. § 404.1520.

Once a claimant establishes that he cannot perform his past work, the burden shifts to the Commissioner to show that he is, nevertheless, capable of performing substantial gainful activity—that he can perform jobs which exist in significant numbers in the national economy. *Hale v. Bowen*, 831 F.2d 1007 (11th Cir.1987); *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir.1985).

## B. *THE ALJ'S DECISION*

ALJ O'Steen found that the claimant was not disabled. The claimant exhausted her administrative remedies when the Appeals Council declined to review the ALJ's decision on September 12, 1997. Tr. 3–4. The claimant had several severe impairments: a cyclothymic disorder, a personality disorder NOS, chronic back pain with degenerative disc disease, a history of fibromyalgia, hypertension controlled, a reflux-esophagitis by history, and irritable bowel syndrome, and a history of a somatization disorder with multiple physical complaints. Tr. 47. Nevertheless, the impairments either singly or in combination did not meet or equal a listed impairment. Tr. 48, 58, 524.

ALJ O'Steen also determined that the claimant's subjective testimony was not entirely credible (Tr. 48, 53, Finding of Fact (FOF) 4). Finally, he found that the claimant retained the residual functional capacity for light work, albeit with nonexertional limitations: frequently crouch, kneel, crawl, perform tasks requiring a fair amount of dealing with the public, dealing with work stresses, understanding and remembering and carrying out detailed job instructions, maintaining her personal appearance or behaving in an emotionally stable manner. In addition, she could not remember and carry out complex job instructions. She could, however, handle simple job instructions. Tr. 49. Therefore, she could return to her previous employment. Tr. 51–52, 53, (FOF 6, 7, 8). A timely appeal to this Court followed.

As previously noted, on October 11, 2002, new ALJ James E. Deen, Jr., issued a forty-nine page partially favorable decision: Specifically, he found that the claimant was at all material times suffering from several "severe" impairments, to wit: hypertension (high blood pressure), a history of diffuse musculoskeletal pain in her lower back and lower extremities; a history of manifold gastrointestinal conditions; a history of substance abuse; a history of depression/ anxiety; a history of a somatization disorder with multiple physical complaints, which impairments, singly or in combination, do not meet or equal the listing of impairments set out in 20 C.F.R. Subpart P, Appendix 1, independent of substance abuse. Tr. 528, FOF 3, 4. The claimant's testimony and statements are not entirely credible. Tr. 528, FOF 5. Although the claimant is not able to perform her past relevant work, she can engage in substantial gainful activity at the sedentary level with respect to several enumerated jobs. Tr. 528, FOF 6, 7. The ALJ also found that the claimant was not entitled to disability benefits before September 1, 1997 and after October 31, 1999, but was entitled to disability benefits for the period September 1, 1997 through October 31, 1999. *See* Tr. 528, FOF 8. He also found that the claimant's history of substance (i.e.alcohol) abuse was a contributing factor material to the determination of the claimant's disability status through August, 1997, thereby disentitling her to disability benefits for said period. Tr. 529, FOF 9. He also found that the claimant's disability ended after October 31, 1999; and, as a consequence, she was no longer

entitled to disability benefits. Tr. 529, FOF 10, 11.

He also rejected the 1997 opinion of the claimant's two treating physicians at GMH, Drs. Antinson and Cobb, on the grounds that their opinions were not supported by objective medical findings, and substantially conflicted with the reports from the claimant's other treating physicians and psychologists, and the consultative physicians and psychologists. Tr. 522–523.

He also found that the claimant's insured status expired on December 31, 1993. Tr. 528. FOF 1. The claimant has not engaged in substantial gainful action since January 15, 1993, the alleged onset of her disability. Tr. 528, FOF 1, 2.

Specifically, the ALJ determined that as of September 1, 1997, the claimant was disabled within the meaning of the Social Security Act (42 U.S.C. § 423, *et seq.*) and entitled to supplemental security income benefits under Title XVI thereof; but that her disability had ended on October 31, 1999. Tr. 483, 511, 519–20, 521, 522, 523, 524, 528. Specifically, he determined that as of that date, the claimant was capable of performing substantial gainful activity at the sedentary level so long as she was properly motivated and not limited by her substance abuse (Tr. 501, 510, 528) to wit: including food checker; cashier; and companion (Wierson) patcher (home appliances), sorter, and cuff folder (Gardner). Tr. 525–26, 528, FOF 6. In that regard, he found that she could only stand/walk for no more than two hours in an 8–hour workday, but could sit for six to eight hours in an eight-hour workday with moderate limitations in bending, balancing, stooping, kneeling, crouching and crawling; slight to moderate limitations in understanding, remembering and carrying out complex/de-

tailed job instructions, no jobs requiring prolonged exposure to outdoor conditions; and the need for a low-stress work environment. Tr. 501, 510.

The ALJ also determined that, based on the testimony of the two Vocational Experts (VE) (Wierson and Gardner) and the other evidence, the claimant was no longer able to perform any of her pastjobs (fast food worker—light/unskilled, motel maid—light/unskilled) nurses aide (medium/semi-skilled); shirt inspector (light/unskilled); deli cook/slicer (light/semi-skilled), and poultry packer/processor (light/unskilled). Tr. 524–25, 528, FOF 7. The ALJ also determined that the additional limitations contained in hypothetical questions from the claimant's attorney, assumed limitations that were not supported by the evidence. Consequently, he rejected the VE's answers thereto. Tr. 526–28.

The ALJ also asked the VEs whether the claimant could perform any of her previous jobs; and the VEs answered "No" if she was limited to sedentary work. Tr. 612. They also testified that the claimant would be unable to work if she had the limitations found by psychologist Jay Clark, PhD. The VEs also testified that if the claimant had the limitations described by psychologist Dr. Dick Maierhofer, PhD. as determined in August, 1995, the claimant was capable of performing sedentary unskilled work. Tr. 615.

Based on the VE's testimony and the use of the grids (Appendix 2 to 20 C.F.R. Subpart P) as a guide, the ALJ also found that the claimant's alcoholism was a material factor disentitling her to her disability benefits through August, 1997. Tr. 528, 529.

As a consequence, and even though she had severe impairments, she was disquali-

fied from receiving disability benefits prior to September, 1997.

He also found that she was no longer disabled after October 31, 1997.

## B. THE COMMISSIONER FAILED TO MAKE PROPER CREDIBILITY DETERMINATIONS

■■■ The Commissioner has wide latitude as the finder of fact to evaluate the weight of the evidence, including the credibility of witnesses. Indeed, credibility determinations lie exclusively within the jurisdiction of the Commissioner, not the Courts. *Ryan v. Heckler,* 762 F.2d 939 (11th Cir.1985); *Owens v. Heckler,* 748 F.2d 1511 (11th Cir.1984).

■■■ In fulfilling this duty the Commissioner is required to consider the claimant's testimony regarding subjective complaints of pain and other impairments. Under appropriate circumstances, he may, nevertheless, reject them as not credible, provided he does so explicitly and articulates specific reasons for his decision. *Walker v. Bowen,* 826 F.2d 996 (11th Cir. 1987); *Hale v. Bowen,* 831 F.2d 1007 (11th Cir.1987); *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir.1986). When the Commissioner articulates adequate reasons for rejecting such testimony, this Court may not substitute its judgment for that of the Commissioner, but must affirm the Commissioner's determination if it is reasonable and supported by substantial evidence. *Powell v. Heckler,* 773 F.2d 1572 (11th Cir.1985).

In light of the evidence as a whole, the ALJ found that the claimant's testimony regarding the pain and limitations was not fully credible. Tr. 501–502, 508, 524, 528 (FOF 5).

■■■ This Court agrees that the claimant's testimony as to her medical conditions generally contradicts the objective medical evidence as determined by her treating physicians. Therefore, in the abstract, an ALJ could find that her testimony is not credible. However, that is precisely the nature of her disabling somatization disorder: the claimant actually believes that she is suffering from disabling medical conditions even though such medical conditions are illusory or less severe. Thus, in order to properly evaluate the claimant's credibility, the ALJ must determine whether the claimant actually believes she suffers from the enumerated severe disabling medical conditions. In assessing and rejecting the claimant's credibility, here, the ALJ rejected the claimant's credibility because it was not supported by objective medical findings. Tr. 501–19, 520–22, 524, 528, FOF 5. His failure to ascertain whether the alleged medical problems were real to the claimant constitute reversible error (i.e. a failure to properly evaluate the claimant's credibility).

This Court is compelled to conclude that the ALJ failed to properly evaluate the claimant's credibility.

## C. THE ALJ FAILED TO PROPERLY CONSIDER THE CLAIMANT'S MENTAL IMPAIRMENT

The claimant contends that the ALJ improperly failed to evaluate her alleged mental impairment.

In order to establish entitlement to disability insurance benefits under Title II or to supplemental security income benefits under Title XVI of the Social Security Act, a claimant must prove that he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to last for a continuous period of not less than twelve months. 42 U.S.C. Sections 423(d)(1)(A) and 1382c(a)(3)(A); *Powell, on behalf of Powell v. Heckler,* 773 F.2d 1572, 1576 (11th Cir.1985). Under 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1200(D),

"...the presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists.... Adequate descriptions of functional limitations must be obtained from these or other sources which may include programs and facilities where the individual has been observed over a considerable period of time."

As shown hereafter, the claimant's treating physicians at GMH and consulting physicians and psychologists determined that she was disabled by a somataform disorder within the meaning of Appendix 1 to Subpart P, § 12.07, commencing in 1995. The ALJ's failure to properly evaluate this evidence compels this Court to conclude that the ALJ failed to properly evaluate the claimant's mental condition, and, as shown hereafter, the opinions of her treating and consulting physicians and psychologists.

### D. THE COMMISSIONER FAILED TO PROPERLY EVALUATE THE OPINIONS OF THE CLAIMANT'S TREATING AND EXAMINING PHYSICIANS

#### The Treating Physicians

In this case, the claimant's treating physicians at Grady Memorial Hospital have diagnosed the claimant as being disabled by virtue of a 20 C.F.R., Subpart P, Appendix 1, § 12.07 somataform disorder, which is defined as:

Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented by evidence of one of the following:

1. a history of multiple physical symptoms of several years duration beginning before age 30 that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly.

2. Persistent nonorganic disturbance of one of the following:

a. vision; or

b. speech; or

c. hearing; or

d. use of a limb; or

e. movement and its control (e.g. coordination disturbances, psychogenic seizures, achiness, dyskinesia); or

f. sensation (e.g. diminished or heightened).

3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

AND

B. Resulting in at least two of the following:

1. marked restriction of daily activities of daily living; or

2. marked difficulties in maintaining social functioning; or

3. marked difficulties in maintaining concentration, persistence or pace; or

4. repeated episodes of decompensation, each of an extended duration.

As previously noted, on January 20, 1994, the claimant returned to Dr. Charles F. Scott, M.D. with complaints of abdominal pain. On examination, her liver, gallbladder, renal aorta and pancreas were all normal. Tr. 345, 348–350. He did, however, consider the possibility of gallstones. He referred her to Dr. Gary L. Richter, M.D., who saw her on February 25, 1994.

On March 18, 1992, she also visited the Fulton County Department of Mental Health. At that time, she was not as depressed, but had suicidal ideations, crying spells, and feelings of helplessness and hopelessness. She also had abused alcohol as a teenager. Tr. 471–73. In addition, as of February 9, 1998, she had been placed in a Supportive Living Program. Tr. 1056.

On June 13, 1993, she saw Dr. Tucker, M.D., with complaints of lower back pain [15] , stress, incontinence (with cough), leg tingling, can't feel sex, can't tell when she needs to urinate or defecate. On examination, her abdomen was soft with active bowel sounds, sensation was intact in both legs and she had good sphincter tone. Diagnoses were left leg numbness, perineal sensation. Tr. 333. Thereafter, on January 31, 1994, she underwent an upper GI and small bowel X-ray; and the doctor found she had a small hiatal hernia and gastroesophageal reflux. Tr. 343–44. She returned again on February 7, 1994 with complaints of chest pains and a cough. No diagnoses with respect thereto was made. Tr. 340.

She returned again on February 15, 1994; and the doctor again diagnosed "HH" with "GERD, and colon polyps." She may have also returned on February 21, 1994. Tr. 340. She returned again on March 14, 1994, May 13, 1994 (complaints and diagnoses illegible). Tr. 330–340.

On August 5, 1993, she underwent an L5–S1 laminectomy with diskectomy, and L5 foramectomy. Tr. 459–463, 465–467.

On November 30, 1993, the claimant visited Grady Memorial Hospital (GMH) with complaints of increased lower back pain, after having undergone back surgery which she stated aggravated her lower back and neck. All of her neurological signs were normal except for her left ankle. Tr. 311. She returned to GMH on October 21, 1993 with complaints of lower back pain, neck pain and left ankle strain. Diagnosis was left ankle and lower back strain. Tr. 313. X-rays of her lower back showed narrowing of the L5–S1 disc space, otherwise normal. Tr. 312.

After apparently being treated for about two months by a chiropractor, she again returned to GMH with complaints of lower back pain extending down both extremities, with burning pain in lower left extremities, and a mild ache in her left thigh; mild pain over lumbar areas, ⊕ SLR bilaterally, with pain. Again, a possible HNP was diagnosed. Tr. 316.

She returned two weeks later on June 30, 1993, again complaining of low back pain, paralysis, numbness, pain, burning, tingling, sore to the touch from her legs to her shoulders. Alternating L & R. She also said she had TB in 1987, but the record is devoid of any evidence thereof. On examination, she had + SLR ® at 40°,-L. She also had 2+ deep tendon reflexes.

---

**15.** As shown hereafter, she was diagnosed with suffering from a herniated nucleus pul-

posa at L5–S1, and underwent a laminectomy. Tr. 335, 459–463, 465–67.

She returned again on June 5, 1994 with complaints of low back pain, anxiety, bleeding ulcers and stomach pain. As she would not stop talking, the doctor referred her to the psychiatric unit for stress control. Tr. 457–58.

On November 17, 1994, she was involved in a motor vehicle collision and sustained a blunt trauma injury. She was taken to the GMH emergency room with complaints of neck and lower back pain. On examination, the back pain was noted, but straight leg raising was negative. Likewise, X-rays of her cervical and lumbar spine were normal. Diagnosis was cervical and lumbar strain. Tr. 453–54.

She returned again on March 5, 1995 with complaints of lower back and lower extremity pain and urge incontinence. The examination was, however, normal. Tr. 440, 450–51.

Apparently, she twisted her ankle on April 7, 1995 and returned to GMH. The ankle was swollen, and a splint was applied. The operative diagnosis was an ankle sprain. Nevertheless, *for the first time,* the doctor also diagnosed her as suffering from a *somataform* disorder. Tr. 448–49. Emphasis supplied.

She underwent a routine mammogram on August 1, 1995, but continued to complain of lower back and ankle pain and vision problems. Apparently, she was also having an anxiety attack and was referred to the orthopedic clinic for low back pain; opthalmalogy for her vision complaint, and continue her anxiety medication. Tr. 445–47.

She returned to the orthopedic clinic on August 18, 1995, with complaints of urinary incontinence, blurred vision, except for myopia and astigmatism. She also had less bowel control and walked with an unsteady gait, *talked unnecessarily,* refused to make eye contact, was almost manic at times with flights of ideas. Emphasis supplied. She could bend and take off her shoes with difficulty, and was able to easily move to a standing position from sitting. Her Waddell signs—TORDS 5/5 were present; and the examination was essentially normal. Again, the doctor diagnosed her as suffering from a somatization disorder. Tr. 441, 443–44.

She returned again on September 7, 1995 with multiple complaints, but the exam was normal. He referred her to physical therapy (PT). Tr. 442.

She returned again to PT on September 28, 1995 with complaints of severe lower back pain; and was given a "back book" and instructions in a home exercise program. Tr. 438.

On September 7, 1995, she returned to the orthopedic clinic and was referred to the pain clinic because of her complaints of pain. It was noted that the doctor was unable to find a surgically detectable problem. In addition, on November 13, 1995, the doctor noted that she underwent a ⊕ MRI in August, 1995 showing L5–S1 disc disease. Tr. 959, 986.

She returned to GMH on November 13, 1995 with complaints of chronic lower back and lower extremity pain. It was also noted that she was suffering from a somatization disorder. On examination, she had a ⊕ SLR at 30° on the L and 40° on the right, with severe tenderness on palpation throughout her lower back; ↓ cold sensation L ankle and foot, but ↑ sensation to pinprick, patella R 2 +, L 1 +, ankle jerk. The doctor was unable to evaluate her with the reflex hammer because of her complaints of severe pain; and he opined she was not a good candidate for a dural steroid injection. Tr. 957, 995.

On November 13, 1995, Dr. John G. Morrow also diagnosed the claimant as suffering from a somatization disorder and chronic low back pain. Tr. 957–995.

On April 22, 1996, June 6, 1996 and July 21, 1997, she returned to GMH with complaints of a constant cough, hearing loss, and jaw pain. Findings were negative, except for TMJ. Tr. 953, 955, 956, 991, 993, 994.

On July 18, 1997, she was seen in the emergency psychiatric clinic by Dr. Bodie N. Dunlap, M.D. for depression and anxiety; but was not psychotic. She also apparently had a history of alcohol abuse until the previous February. Relevant DSM IV mental diagnoses were -

AXIS I: dysthymia (i.e. severe depression);

AXIS II: deferred;

AXIS III: arthritis, nausea with narcotics;

AXIS IV: homeless;

AXIS V: 60/unk.

Tr. 990.

Her July 21, 1997 annual gynecological examination was normal. Tr. 952.

She again returned on August 1, 1997 with complaints of chronic stomach pain and chronic diarrhea. Dr. Theodore Antison noted that she suffered from a somatization disorder, GERD since 1994, and gallstones since 1996. A 1996 CGD failed to disclose any ulcers or inflammation; an endoscopy showed polyps and hemorrhoids. He referred her to "GI." Tr. 951, 982 (duplicate).

She returned to the mental health unit on August 21, 1997. The doctor apparently observed alcohol abuse, but his notes are mostly illegible. Her mental status examination was normal. DSM—IV diagnoses were -

AXIS I: 300.4;

AXIS II: Ø;

AXIS III: (disc deterioration, hiatal hernia, Briquet's syndrome/somatization disorder and depression).

Tr. 947, 987.

Her September 16, 1997 mammogram was also normal. Tr. 945, 984.

She apparently returned to the mental health clinic on October 8, 1997. DSM—IV diagnoses were -

AXIS I: 296.32; 300.81;

AXIS II: Ø;

AXIS III:(1) disc?; (2) Briquet's syndrome (i.e. former title of somatization disorder), (3) hiatal hernia, and (4) acid reflux.

Tr. 944, 983.

She returned again on October 17, 1997 with complaints of left leg numbness. Tr. 1,000.

On October 31, 1997, Dr. Theodore J. Antinson, M.D., attending physician, and Dr. Kelly Cable, M.D., Resident Physician, wrote a joint "To Whom it May Concern" letter stating that the claimant was being treated at GMH for multiple medical and psychiatric problems, including a somatization disorder which has left her severely disabled and requires frequent medical follow ups. She also suffers from major depression, panic attacks, arthritis, and gastroesophageal reflux. Tr. 970.

The claimant returned to the Mental Health Unit on November 5, 1997. Her mental status examination was essentially normal, although she was hyperverbal,

pressured, reclusive, rambling, and responses to structures. The DSM IV diagnoses were -

AXIS I: 296.32, 300.81;

AXIS II: Ø;

AXIS III:(1) disc?; (2) Briquet's Syndrome (i.e. somatization disorder); (3) hiatal hernia; (4) acid reflux. Tr. 942.

The record also contains a November 18, 1997 urgent care center assessment (Tr. 938–940) and a December 17, 1997 opthalmalogic examination and eyeglass prescription. Tr. 937–938, 1002–03, 1007.

She returned again (perhaps on December 31, 1997) with complaints of ↑ epigastric pain, spasms, regur digested food, poor sleep, muscle soreness. Results from the physical examination were (1) abdomen BSND soft? epigastric area + LLQ; (2) somatization disorder, (3) GERD and (4) back pain. Tr. 946.

She returned two weeks later for a follow up, with continued complaints of LLQ pain and episodes of painful defecation? tensing of? muscles, weakness, loss of concentration and blindness, sore throat, tingling in arm & neck like cold chill ↓ ADLs, left leg ↑ aching, extremely anxious, hyper talkative, agitated. Diagnoses included (1) somatization disorder, (2) diarrhea, (3) weakness/hearing, (4) HNT ↑ 2 anxiety ? s. somatization out of control, attempted to explain multiple unexplained complaints? Tr. 948.

A third entry (perhaps dated December 31, 1997) indicates she returned again with complaints of throat inflammation, swelling in left wrist, off & on fire for three weeks, tightness in throat "choking," also a syncope episode. Her past medical history listed 13 separate medical problems including (10) depression, (11) somatazone/Briquet's Synd. Tr. 950, 989.

On March 7, 1998, she returned to the orthopedic clinic for a follow up on her complaints of chronic lower back pain. The doctor noted she walked with L LE extern rotated o/w wl gait, motor 5/5 B ue/le, sensory retract, 1 sy? B, knee/hip "RO" benign, (-) tn ? sign, X-rays: ? cervical spondylosis, [illegible character] evid. of instability, lumbar spine with mild DDD/DJD. A/P 40 year old female with cervical and lumbar spondylosis. No evid. of radiculapathy. He also noted that she had a significant psychiatric history including somataform D/O. Tr. 941, 981.

She again returned to the mental health clinic on May 6, 1998, apparently for group therapy, and stress management. Her anxiety had increased, and she had increased coping skills. However, she was wearing a knee brace and had not gotten out of her chair for 3—4 days. The mental status exam was normal. DSM—IV diagnoses were -

AXIS I: 296.32, 300.81, 300.19.

Tr. 935.

On May 13, 1998, she again returned for group psycho discussion—wellness ? to ↓ depression ↓ impulsivity, and ↑ knowledge of vitamin A and K. Summary—fair participation, patient still appeared depressed, but patient warned what Vitamin E and K's relationship to the body. Her mental status examination varied from fair to poor. DSM—IV diagnoses were -

AXIS I: 305.00, 300.19, 300.81, 296.32;

AXIS II: Ø;

AXIS III: 401.9, 530.81, 553.3, 722.6, 795.5.

Tr. 934, 1014.

On May 20, 1998, Dr. Charles Duckworth, M.D., Division of Digestive Dis-

eases, performed an upper endoscopy. Diagnoses were a slight abnormality in her food tube (Barrett's esophagus) which protects against acid reflux. Tr. 929–32, 969, 1008, 1010–12.

She underwent another eye examination (normal) on May 28, 1998 (Tr. 928), and returned to the otolaryngology clinic on June 2, 1998 with complaints of a hearing loss and throat problems. Diagnoses were (1) severe GERD, hiatal hernia (Barrett's esophagus) followed by GI, (2) longstanding moderate to severe SNHL. Tr. 927.

She also returned to the mental health unit on June 26, 1998 and July 10, 1998 to decrease her depression, reduce suicidal ideation, increase coping and social skills. DSM—IV diagnoses were -

AXIS I: 305.00, 296.32 (on June 26th), 305.00, 296.32, 300.19 and 300.81 (on July 10th).

She also had her annual gynecological examination on June 30, 1198 with a follow up on August 13, 1998. Se complained of abdominal discomfort—diffuse ↓ abd on L in ?, on R midcycle + bloating, etc. Diagnoses included (1) abdominal discomfort, (2) somatization disorder, etc. Tr. 919, 952. An August 5, 1998 sonogram of her pelvis and vagina were also normal. Tr. 919.

She returned to the orthopedic clinic on August 18, 1998 with complaints of right foot problems. It was also noted she had multiple psychological problems. Diagnoses were: (1) R foot _____ neuroma, (2) R 3rd and 4th toe long prominence. Recommendation was removal of the metatarsal foot pad. Tr. 718.

She returned on August 24, 1998 with complaints of a rash, night sweats, and walking difficulty. She had also seen ENT and GI concerning her throat/GERD. Diagnoses were: (1) HTN → borderline high. diast. continue to observe (2) reflux → GI. Following history to be evaluated for ? (3) somatization d/o clonazepan ⁻ with improvements to move hand (4) arthritis [illegible character] stable ® knee worse on walking, and (5) rash. Tr. 918, 1009.

She returned to the Neurology Clinic with complaints of asthma attacks, whole body numbness, R side neck pain, R leg numbness, R neck and R arm pain with intermittent B UE "twists" with movement. Also complains of ↑ ing L leg numbness and pain since 1993 surgery. Diffuse B V E numbness, arm pain—all non-lateralizing, burning of all limbs ... diagnoses included (1) multiple somatic complaints w/ somatization d/o ... (2) ↓ L ankle reflex ... Tr. 916.

On September 11, 1998, Dr. Cobb also wrote a "To Whom it May Concern" note advising that GMH was treating the claimant for fibromyalgia, somatization D/O, GERD & HTN. He was hopeful she would improve with frequent medical treatment. Tr. 913–915.

She returned in October, 1998 with complaints of diarrhea, nausea, fatigue, L side pain, burning in foot, leg and abdomen, burning and tingling in her arms and face, weakness spells, severe reflux?, fibromyalgia, hx of C6 fracture. Diagnoses again included (1) somatization ... Tr. 912.

In October, 1998, she also returned and underwent the suggested foot surgery. Tr. 972–79. In addition, she went to the orthopedic clinic on October 17, 1998 with complaints of right leg numbness. The doctor again diagnosed a somatization disorder. Tr. 943.

The last GMH entry is October 26, 1998 or July 10, 1998 when she returned with

complaints of LLE edema with walking, dizzy spells, increased depression history, lower abdominal cramp-like pain. Dr. Cobb's diagnoses again included (1) somatization. Tr. 922.

She was also treated in 1995 at the Fulton County Alcohol & Drug Treatment Center (Tr. 352–60) in 1994 and 1995 at the W.T. Brooks Clinic of Grady (Tr. 362–66); in 1993—1994 at the South Fulton Medica Center (Tr. 267–278, 318–334, 1026–1054); in 1994 at the Georgia Regional Hospital for major depression and potential suicide (Tr. 373–74, 369–97); in 1994 by Dr. E. Clifford Beal, M.D., psychiatrist (for major depression) (Tr. 398–405); in 1995 at the Vision Psychological Rehabilitation Program (depression) (Tr. 851–57).

Additional relevant findings include Dr. Kusuma S. Raos', M.D., psychiatrist June, 1999 finding that the claimant was extremely anxious, nervous, and severe depression (Tr. 1161–62); a January 15, 2001 mental status examination with a diagnosis including a major depressive disorder (Tr. 1171–72); Dr. Page B. Pennell's, M.D. notation of June 5, 2000 that the claimant had undergone two significant medical events: the first in April, 1997 when she underwent rapid right-sided facial numbness followed by paralysis in her four extremities, and the second in February, 2000 when she experienced facial numbness followed by upper body paralysis, and shaking and trembling of an extremity. He also noted that she frequently reported somatic symptoms. Tr. 1132–38.

### The Consultative Physicians and Psychologists

In addition to the treating physicians, including psychiatrists and psychologists, she was also seen by consultative physicians and psychologists.

On August 22, 1995, she was given a consultative examination by Dr. G.N. Kini, M.D. Insofar as relevant, he diagnosed her as suffering, *inter alia,* from (1) chronic anxiety neurosis and depression, and that she had multiple problems, mostly related to her anxiety and depression. In essence, he also found that she was then disabled for work, but felt that she might be able to eventually return to work if she received proper psychotherapy and pharmacotherapy treatment. Tr. 408–13.

Dr. Dick Maierhofer, PhD. also examined her on August 16, 1995. He found that she was, *inter alia,* anxious and depressed, but not suicidal or homicidal or psychotic. He opined she might be able to perform some work, but he also opined that her prognosis for sustained employment was limited. Tr. 419–23.

### Dr. W. Jay Clark, PhD.

Dr. Clark examined the claimant on December 19, 1997. In his opinion, her prognosis was poor, she was not ready for work, and she could only perform very simple, stable jobs involving adequate supervision. He also diagnosed her as suffering from a somatization disorder: (DSM—IV AXIS I: 300.81); and a major depressive disorder, recurrent, severe: (DSM—IV AXIS I: 296.33). Tr. 860–63.

### Dr. Robert T. Shephard, PhD.

Dr. Shephard examined her on October 5, 1998. In essence, he found that she was disabled for work based, *inter alia,* on her severe anxiety disorder (DSM—IV # 300.02) and panic disorder (DSM—IV # 300.01). Tr. 962–68.

 Ordinarily, the Commissioner (nee ALJ) must accord "great weight" to

the opinions of treating physicians. He may, however, reject those opinions for good cause (i.e. where, for example, a physician's opinion is unsupported by objective clinical findings, is contradicted by other opinions which are supported by such clinical findings, or is merely conclusory). *Crawford v. Commissioner of Social Security,* 363 F.3d 1155 (11th Cir.2004) 363 F.3d 1155, 2004 WL 595281; *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir.1997); *Lamb v. Bowen,* 847 F.2d 698 (11th Cir. 1988); *Johns v. Bowen,* 821 F.2d 551 (11th Cir.1987); *Jones v. Bowen,* 813 F.2d 411 (11th Cir.1987); and *Broughton v. Heckler,* 776 F.2d 960 (11th Cir.1985). Further, the Commissioner may also reject a physician's opinion when all of the evidence of record supports a contrary conclusion. *Bloodsworth v. Heckler,* 703 F.2d 1233 (11th Cir.1983). It is reversible error for an ALJ to reject uncontradicted medical evidence and fail to articulate adequate reasons for doing so. *Ryan v. Heckler,* 762 F.2d 939 (11th Cir.1985).

Here, this Court is compelled to conclude that the claimant *in fact* carried her burden and established through credible, objective, medical evidence that claimant was unable to perform claimant's past relevant work as a fast food worker, nurses' aide, a motel maid, a deli clerk, shirt inspector or poultry processor. The ALJ apparently credited this evidence; and, therefore, found that the claimant could not perform her past relevant work. However, based on the VEs' answers to hypothetical questions, the ALJ determined that the claimant could perform substantial gainful activity at the secondary level. Tr. 501, 525, 526, 528, FOF 6 and 7. In short, he improperly rejected the opinions of the claimant's treating physicians. As a consequence, this constitutes reversible error.

E. *THE ALJ ERRED IN FINDING THAT THE CLAIMANT'S ALCOHOL ABUSE WAS A MATERIAL FACTOR TO THE CLAIMANT'S DISABILITY PRIOR TO SEPTEMBER, 1997*

This Court agrees that the ALJ properly found that this record is replete with evidence that the claimant abused alcohol for a substantial period of time and was treated therefor. *See* the reports of Dr. E. Clifford Beal, M.D., Georgia Regional Hospital; the Fulton County Alcohol and Drug Treatment Center; Dr. G.N. Kini, M.D. Tr. 488–491, 512–513, 517, 519, 524. This Court also agrees that the claimant bears the burden of establishing that her alcohol abuse was not a material factor in her disability. *See* 42 U.S.C. § § 423(d)(2)(C), 1382C (a)(3)(J). Indeed, the claimant advised psychologist Dr. R.A. Maierhofer, that she had stopped drinking in October, 1994. *See also* Tr. 17, 103, 105–06, 391, 603–04. Cf. Tr. 990.

The record further shows that the claimant complained about mood swings when she was drinking. *Id.*

This Court is, however, compelled to conclude that the record is devoid of any evidence that her alcohol abuse was a material factor in her disabling somatization disorder after April, 1995 when she was first diagnosed therewith. Thus, the ALJ's decision to the contrary is not supported by substantial evidence and constitutes reversible error.

*CONCLUSION*

This Court is compelled to conclude that the ALJ committed reversible error when he failed to properly evaluate the claimant's credibility; when he failed

to give proper weight to the claimant's treating physicians' opinions; and when he determined that the claimant's alcohol abuse was a material factor in her disability prior to September 1, 1997. This Court is also compelled to conclude that the ALJ committed reversible error when he found that a consultative physician, Dr. Kini, concluded that the claimant was not disabled. As noted above, Dr. Kini opined that she was then disabled, but he was hopeful she could be returned to the work force with proper treatment. As noted above, the record included numerous signs and symptoms of the claimant's disability from her somatization disorder; and the ALJ's holding to the contrary was clearly erroneous.

In addition, it is also clear that the claimant's disability began in April, 1995 and did not terminate on October 31, 1999, but has continued. *See* Dr. Cobb's note of September 11, 1998. Tr. 913. Therefore, the ALJ's finding that the claimant was not disabled until September 1, 1997, and that her disability ended on October 31, 1999, is clearly erroneous.

IT IS THEREFORE ORDERED that the Commissioner's decision be RE-VERSED; that the claimant be awarded disability benefits from April, 1995 forward (Tr. 408–449), and that this case be REMANDED to the Commissioner for the recomputation of benefits.

This Court would, however, be remiss in its duty, if it did not acknowledge the superior efforts displayed by ALJ Deen in attempting to decide this case. The problem lies in part with the facts that requests for *de novo* administrative hearings have tripled from less than 200,000 per year to 638,769 in 2003, and the Bureau of Hearings and Appeals is short at least three hundred ALJ's, and a several years' freeze has prevented the hiring of additional ALJ's, and the 1,016 ALJ's must now decide an average of 47½ cases a month, almost double the previous figure of 25 cases per month. Indeed, in 2003, the ALJs issued 571,928 opinions and 262,715 so far in 2004. *See* Attachment 1, Communication from Chief Administrative Law Judge David Washington, Bureau of Hearing and Appeals, Social Security Administration. It is a wonder that the ALJ Corps is able to do as good a job as it does.

Attachment 1

## SOCIAL SECURITY

Attachment 1

**MEMORANDUM**

Date: 4/14/04

To: JUDGE FELDMAN

From: David B. Washington
Chief Administrative Law Judge

Subject: OFFICE OF HEARINGS & APPEALS - JUDGES

Dear Judge Feldman.

Please let me know if you need any additional information. Also please mail me a copy of your decision marking the Envelope "pretrial"

CURRENT CASE LOAD: 638,769
DECISIONS ISSUED IN '03: 571,928
DECISIONS TO DATE IN '04: 262,715
DRAFT DECISIONS PER MONTH 38,000
NUMBER OF JUDGES: 1016
AVG. DECISIONS PER MONTH PER JUDGE: 47½

TEL. 703-605-8600
FAX 703-605-8501

**DAVID B. WASHINGTON**
CHIEF ADMINISTRATIVE LAW JUDGE

OFFICE OF HEARINGS AND APPEALS
ONE SKYLINE TOWER
SUITE 1500
5107 LEESBURG PIKE
FALLS CHURCH VA, 22041

Attachment 1

TOTAL P.02
04/14/2004 WED 11:48 [TX/RX NO 5778] 002

## ORDER ON MOTION FOR RECONSIDERATION

▮ Presently pending before the undersigned is the Commissioner's Fed. R.Civ.P. 59(e) Motion [Doc. 25] that this Court reconsider its 42 U.S.C. § 405(g) sentence four determination and Order of April 21, 2004 that the claimant is disabled, with a remand to the Commissioner to determine the amount of such SSI benefit [Doc. 23]. Specifically, the Commissioner contends that reconsideration is mandated because:

1. This Court is not empowered to reverse the Commissioner's determination on disability and remand for computation of the amount of such benefits from a date certain;[1]

2. This Court improperly added an unauthorized element to the applicable pain evaluation standard;[2]

3. This Court is not empowered to order a sentence four remand for an award of benefits when the ALJ's error was the misapplication of the pain standard (i.e. misapplication of the correct legal standard);[3]

4. This Court erred in determining that plaintiff's alcohol consumption was not a material factor in the claimant's disability after April, 1995 (i.e. this Court's determination that the record was devoid of any evidence that plaintiff's alcohol consumption was a material factor in claimant's disability after April, 1995);

5. This Court erred in finding that the ALJ failed to properly weigh the opinions of the claimant's treating physicians (i.e. as set out in the hypothetical questions the ALJ posed to the Vocational Expert in the 1999 and 2001 hearings);[4] and

6. Even if the ALJ failed to properly weigh the objective medical evidence from the treating physicians, such error did not affect the outcome of the case.

Also pending is the claimant's response to the Commissioner's Motion for Reconsideration [Doc. 26], which response contends that the Commissioner's complaints are without merit.

As is evident to the casual observer, the instant case was extremely complex as evi-

---

1. The Commissioner further contends that in an SSI case, the claimant must also meet certain non-disability eligibility (financial) requirements which allegedly have not been considered by the Commissioner. *See* 20 C.F.R. § § 416.202(c), (d); 416.330(a); 416.1402. The Commissioner has failed to enumerate what matters she has not yet considered. This Court notes that in her application for SSI benefits, the claimant contends that she has no resources, has never worked in a job covered by Social Security, is not eligible for other benefits, and received food stamps. She also has a child receiving SSI benefits. Tr. 139–142, 641, 703–706. *See also* her earnings record showing no earnings since 1990. Tr. 707. Furthermore, it would appear that the ALJ determined she was eligible for SSI benefits when he found she was disabled from September 11, 1997 through October 31, 1999. Tr. 477–529. *See also* Tr. 117–120. *But see* Tr. 125–126.

2. Whether the alleged disabling pain was real to the claimant.

3. That the correct legal remedy is a remand for consideration by the ALJ utilizing the proper legal standard.

4. The Commissioner also argues that the ALJ was prohibited from giving any weight to a treating physician's determination that his patient (the claimant) was "disabled," as that determination is reserved for the Commissioner. *See* 20 C.F.R. § 416.927(c). This Court must infer that the word "disabled" is a word of art; and only the Commissioner is authorized to determine whether an applicant for disability benefits is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. § 423(d)(1). Nevertheless, a physician is also entitled to utilize the word "disabled" when evaluating his patient's physical or mental limitations, and whether such limitations limit or exclude employment. Thus, the ALJ is obliged to consider such evidence and give it appropriate weight even though the physician utilized the word "disabled" in making his determination as to his patient's limitations. *Chappell v. Schweiker,* 599 F.Supp. 1 (N.D.Ga.1983). Indeed, the word "disability" has a different definition in the Americans with Disabilities Act (42 U.S.C. § 12102(2)).

denced by the fact that it involved reversal and remand by the Eleventh Circuit Court of Appeals; a remand by this Court to the Commissioner; three separate administrative evidentiary hearings before two separate ALJ's; three separate applications for disability benefits; a partially favorable 49–page opinion from the second ALJ that the claimant was disabled from September 1, 1997 through November 1, 1999, but not before September 1, 1997, or after November 1, 1999; and, as a consequence, was entitled to SSI benefits.

In its opinion, this Court attempted to describe all of the objective medical evidence of record including those medical records which predated the alleged onset of the claimant's disability. In this regard, it is important to note that the claimant was treated on a number of occasions by physicians associated with Grady Memorial Hospital (GMH); and that during her visit of April 7, 1995, one of the treating physicians determined that the claimant was suffering from, *inter alia,* a somatization disorder. Tr. 448–49.

It is also important that she had been suffering from lower back pain since 1993, which pain radiated into her lower left extremity with, *inter alia,* positive straight leg raising. On July 14, 1993, she underwent an MRI of her lower spine which resulted in a diagnosis of a left lateral disc herniation at the L5–S1 disc space and possible compression of the L5 and S1 nerve roots. Tr. 314. On August 5, 1993, she underwent back surgery at GMH: a left L5–S1 laminectomy with diskectomy and L5 foraminatomy. She, nevertheless, returned to GMH with continued complaints of low back pain, and an October 21, 1993 back X-ray showed narrowing of the disc space at L5–S1.

She returned again in June, 1994 after being involved in a motor vehicle collision.

At that time, back pain was again noted with a diagnosis of a cervical and lumbar strain. Tr. 454.

She return again on March 5, 1995, with complaints of low back and lower extremity pain. The treating physician was not able to find the presence of a medical problem causing such pain. Tr. 440, 450–451.

As previously noted, she again returned to GMH on April 7, 1995 after twisting her ankle. The doctor applied a splint to her ankle sprain and also diagnosed her as suffering from a somatization disorder. Tr. 448–49. She returned to the orthopedic clinic again on August 18, 1995. Although the physical examination was essentially normal, the treating physician observed mental problems, to wit: talks unnecessarily, does not make eye contact, often manic at times, flight of ideas. Tr. 441, 443–444.

On return visits on September 7, 1995, September 13, 1995, September 28, 1995, and November 13, 1995, she persisted in complaints of low back pain. The treating physician noted severe tenderness on palpation and positive straight leg raising. She was also interviewed by a treating physician, Dr. John G. Morrow, M.D., who also diagnosed the claimant as suffering from a somataform disorder. Tr. 957, 995.

At some time prior to July 18, 1997, she was seen by Dr. Bodie N. Dunlap, M.D. in the GMH Psychiatric Emergency Clinic, who admitted her to the unit, and discharged her on July 18, 1997. He also noted that she had a history of alcohol abuse until that February. Tr. 990. Apparently, she was also seen in the Mental Health Unit on August 21, 1997, and the treating physician noted a past history of alcohol abuse. Diagnoses included "AXIS

III: 'Briquet's syndrome/somataform disorder.'" Tr. 947, 987. *See also* evaluation of October 8, 1997. Tr. 944, 983. Indeed, on October 31, 1997, two treating physicians, Drs. Theodore Antinson, M.D. and Kelly Cobb, M.D., wrote a joint "To Whom it May Concern" letter advising that the claimant was suffering from, *inter alia,* "a somatization disorder (formerly known as Briquet's Syndrome), a chronic disorder characterized by multiple somatic symptoms in multiple organ systems. She is severely disabled by this condition and requires frequent medical follow ups." Tr. 970. *See also* the evaluations of November 5, 1997. (Tr. 942); December 31, 1997 (Tr. 946, 948, 950, 985, 989); March 7, 1998 (941, 981); June 30, 1998 (Tr. 925); August 24, 1998 (Tr. 916, 918, 1009).

On September 11, 1998, Dr. Cobb wrote another "To Whom it May Concern" letter noting that the claimant was being treated at GMH for, *inter alia,* fibromyalgia and somatization "D/O." Tr. 913. *See also* diagnoses of October, 1998. (Tr. 912); October 17, 1998 (Tr. 943); October 26, 1998 (Tr. 922).

From June through September, 1994, she was also treated by psychiatrist, E. Clifford Beal, M.D. of the Fulton County Alcohol and Drug Treatment center. His diagnoses included "a possible delusional disorder," and an "alcohol related disorder", with periodic alcoholic drinking binges and was to be scheduled for an outpatient detoxification program. (Tr. 398–99; 404–05).

On November 17, 1994, the South Fulton Mental Health Center had her admitted to the Georgia Regional (mental) Hospital for depression. At that time, Dr. A. Ahmed, M.D., noted that, *inter alia,* her alcohol abuse may have been in remission. Tr. 374–379.

In January, 1995, the claimant was also treated for six days at the Fulton County Alcohol and Drug Treatment Center, with a goal of detoxification.

She also sought treatment at the GMH W.T. Brooks Clinic; and, during a February 15, 1995 visit, it was noted that she was extremely anxious with non-stop talking. Tr. 362.

During an August, 1995, visit to the Butts County Medical Center, she denied having a current problem with alcohol. Tr. 475–476. *See also* the August, 1995 and August, 1996 notes to the same effect from Vision Psychological Rehabilitation Program. Tr. 854–855, 857.

It is clear that the treating physicians at Vision Psychological Rehabilitative Program diagnosed the claimant as suffering from (1) a depression disorder (R/O major depression), and an anxiety disorder NOS (not otherwise specified). Tr. 854–55. In addition, the doctor noted on her May 5, 1997 visit that she had "numerous somatic complaints." Tr. 852–852.

In addition, on March 27, 1997, she was seen by Dr. Krishan Gupta, M.D. on the referral of Dr. Vicky James, M.D. At that time, he reported that she advised that she had stopped drinking one year earlier. Tr. 17. In addition, during her treatment from October 24, 1996 through June 30, 1997 by Dr. Vicki James, M.D., James does not mention that the claimant has any problem with alcohol. Tr. 840–850. In addition, her treatment by the physicians at Spalding Regional Hospital did not note that she had any problems with alcohol. Tr. 908–11, 1020–22, 1178.

In 1997, she was treated by Dr. Anthony Ferrara, M.D. at the Spalding Regional Hospital for low back pain aggravated by an automobile collision. Diagnosis was de-

generative disc disease. Tr. 911, 1022. She returned in April, 1998, and was treated by Drs. H. Michael Webb, M.D. and Ronald C. Gay, M.D. for trembling and leg weakness, chronic low back pain, weak neck and muscles. Lumbar X-rays showed mild osteoporosis and mild spondylosis at L5. Tr. 908–10, 1020–21.

In 1999, she was also treated thereat by gastroenterologist Dr. Appaswany M. Gowda, M.D. Diagnoses included internal hemorrhoids, partially blocked gallbladder with gallstones and depression. Tr. 65–67. He also referred her to Dr. Kusuima S. Rao, M.D., apparently a psychiatrist. She was extremely anxious, nervous and depressed with severe signs of neurovegetative signs of depression, insomnia and inability to concentrate, irritability and panic attacks. Her memory was also clouded by anxiety, and her judgment was questionable. Diagnoses included—AXIS I: depression, severe in nature, without psychotic features, questionable bipolar disorder. Tr. 1163–64, 1174–75. Her 2002 visit is not relevant to the instant issues. Tr. 1178.

In June, 2002, she returned to the Spalding Regional Hospital and was treated by Dr. David A. Van, M.D. Diagnoses were possible infiltration in the right base and heart problems. Tr. 1178.

Beginning in 1999 through February, 2001, the claimant was also treated at the IRIS Counseling Alliance; and on January 15, 2001, she underwent a mental status examination. The doctor noted she was irritable, sensitive and withdrawn; and her mood and affect were anxious and depressed. None of these were caused by her consumption of alcohol, and no alcohol or drug abuse. Diagnoses included: AXIS I: major depressive disorder. Tr. 1171–95.

Her treatment in 2002 by physicians at the McIntosh Trail Family Practice and the Emory Clinic (Tr. 1139–1153) are not relevant to the instant issue.

She also underwent several consultative evaluations, to wit:

1. Dr. G.N. Kini, M.D. (Aug. 22, 1995); and several psychologists;

2. (a) Dr. Dick Maverhofer, PhD. (August 12, 1995);

(b) Dr. W. Jay Clark, PhD. (January 5, 1998); and

(c) Dr. Robert T. Shepard, PhD. (October 5, 1998).

Tr. 408–413; 414–423, 859–863, 960–968.

Insofar as relevant here, Dr. Kini diagnosed her as suffering from, *inter alia,* LR–5–S1 degenerative disc disease with muscle spasm causing chronic back pain; chronic anxiety neurosis and depression.

Dr. Maverhofer observed that the claimant exhibited anxiety and depression related to family problems; no psychotic symptoms (such as delusions or hallucination). Apparently, she reported that if she uses alcohol while on medication, she gets depressed and upset. He diagnosed her as suffering from, *inter alia,*

AXIS I:(DSM) 301.13, cyclothymic disorder;

AXIS II:(DSM) 301.9, personality disorder, NOS;

AXIS III: .... back pain, and ankle pain.

He also observed that her prognosis for sustained employment was limited. Tr. 419–423.

Dr. W. Jay Clark determined that her prognosis was poor, and she has not profited from therapy. She also had several work-related problems including:

(A) difficulty in understanding and carrying out her employer's instructions;

(B) a marked tendency to become lost in rumination concerning her ills, anxieties and insecurities, and a loss of touch with ongoing activities; and

(C) she is not presently ready to work; she will not do well in jobs that involve changes; and, if she works, it must be in very simple, stable jobs involving adequate supervision.

His diagnoses were, *inter alia:*

AXIS I:(1)(DSM) 300.81 somatization disorder;

(2) (DSM) 296.33—major depressive disorder, recurrent, severe . . .;

AXIS II: history of multiple physical disorders plus lower back injury.

Tr. 859–863.

In his October, 1998 evaluation, Dr. Robert T. Shepard noted that the claimant had a difficulty in hearing. She also has memory and common sense difficulties; difficulty controlling her impulses, temper and emotions, and faints under stress. She suffers from real problems which make her difficult to treat. His diagnoses included:

AXIS I:(1)(DSM) 300.2—generalized anxiety disorder, severe; and

(2) (DSM) 300.01—possible panic disorder without agoraphobia.

Employment difficulties included:

(1) seriously limited ability to make occupational adjustments, follow work rules, deal with the public, deal with ordinary work stresses, function independently and maintain attention and concentration, relating to co-workers and using judgments;

(2) making performance adjustments, no useful function in understanding, remembering and carrying out detailed job instructions; limited but satisfactorily understanding, remembering and carrying out simple job instructions;

(3) making personal—social adjustments including a serious limitation in behaving in an emotionally stable manner.

He also noted that she was seriously limited in her ability to complete a normal work day and week because of interruptions from her psychologically based symptoms. She was moderately limited in interacting appropriately within the public, asking simple questions and requesting assistance, getting along with co-workers, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places and using public transportation, setting realistic plans and goals. She was markedly limited in her ability to accept instructions and respond appropriately, and respond to work setting changes.

The claimant was also evaluated by two non-examining psychologists, Dr. Allen Carter, PhD. (on August 22, 1995), who opined, *inter alia,* that the record failed to show she had a somataform disorder or a substance addiction disorder (Tr. 424–433).[5] He, nevertheless, opined that she had severe affective and personality disorders which necessitated a residual functional capacity assessment; and Dr. John W. Hollender, PhD. (on January 14, 1998), who noted that the claimant required a residual functional capacities assessment because she was suffering from a severe

---

**5.** As noted above, his diagnosis has been overtaken by the evaluation of treating physicians and psychiatrists; and is, therefore, meaningless.

affective disorder (i.e. § 12.04—a somatization disorder, major depression, and dysthemia). He also opined that she could engage in substantial gainful activities involving simple instructions.[6] Tr. 864–885.

On January 16, 1998, a non-examining physician. Dr. K. Esna–Ashari, M.D., also evaluated the claimant's ability to work despite her degenerative joint and disk disease, and spondylosis, finding that she could engage in substantial gainful activities.[7]

Another non-examining physician, Dr. Philip E. Gertler, also evaluated the claimant's work abilities on March 9, 1998. He reached the same conclusion as Dr. Esna–Ashari. Tr. 886–893.

Non-examining psychologist, Dr. Robert T. Cayle, PhD., also evaluated the claimant's work abilities, and determined she could engage in substantial gainful activities. Tr. 904–05.

*Discussion*

1. *This Court is empowered to reverse the Commissioner's findings involving disability and disability award disabilities benefits.*

 The question of whether this Court can reverse the Commissioner and award disability benefits without a remand for further consideration is answered in the statute (i.e. sentence four of 42 U.S.C. § 405(g) to wit):

 (g) . . . The Court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

with or without remanding the cause for a rehearing.

Indeed, the Eleventh Circuit stated in *Davis v. Shalala,* 985 F.2d 528, 534 (11th Cir.1993):

 Generally, a reversal with remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards. *See Walker v. Bowen,* 826 F.2d 996 at 1001–02. This Court, however, may reverse the judgment of the District Court and remand the case for an entry of an Order awarding disability benefits where the Secretary has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. (Citations omitted).

*See also Bowen v. Heckler,* 748 F.2d 629, 636 (11th Cir.1984). As was noted in *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 174 (6th Cir. 1994):

 If a Court determines that substantial evidence does not support the Secretary's decision, the Court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.

*See also Fields v. Harris,* 498 F.Supp. 478 (N.D.Ga.1980); *Moisa v. Barnhart,* 367 F.3d 882 (9th Cir.2004); *Parks v. Sullivan,* 766 F.Supp. 627 (N.D.Ill.1991); *Armstrong v. Sullivan,* 814 F.Supp. 1364 (W.D.Tex. 1993). *See also Harris v. Secretary of Health and Human Services,* 821 F.2d 541 (10th Cir.1987). *Compare Boyd v. Heckler,* 704 F.2d 1207 (11th Cir.1983).

---

**6.** This diagnoses has been overtaken by events as the ALJ determined that the claimant was disabled during this period.

**7.** *See* Fn.6 above.

Such is the case here. Thus, this ground is without merit.

2. *This Court did not add an unauthorized element to the standard to evaluate pain.*

As previously noted, the statute defines the word "disability" with respect to whether a claimant is eligible for SSI disability benefits. *See* 42 U.S.C. § § 423(d), 1382(a) and 1382c(a)(3). So as to augment the statutory definition, the Commissioner has adopted a Listing of Impairments which, if present, entitle a claimant to Social Security and Supplemental Security Income benefits. *See* 20 C.F.R. Subpart P, Appendix 1. Included therein are mental disorders (impairments) (*see* 12.00) including affective disorders (§ 12.04) and somataform disorders ( § 12.07). Indeed, somataform disorders are disorders which include "physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." *Id.*

In order to be eligible for disability benefits for a somataform disorder, the claimant must show:

A. Medically documented by evidence of one of the following:

 1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

 2. Persistent nonorganic disturbance of one of the following:

 a. Vision; or

 b. Speech; or

 c. Hearing; or

 d. Use of a limb; or

 e. Movement and its control (e.g. coordination disturbance, psychogenic seizures, akinesia, dyskinesia); or

 f. Sensation (e.g. diminished or heightened).

 3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

AND

B. Resulting in at least two of the following:

 1. Marked restriction of activities of daily living; or

 2. Marked difficulties in maintaining social functioning; or

 3. Marked difficulties in maintaining concentration, persistence, or pace; or

 4. Repeated episodes of decompensation, each of extended duration.

Indeed, as noted in A(3) above the claimant must present evidence of an "unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury".

This is precisely the element which the Commissioner now criticizes— an unrealistic belief that the claimant has a serious disease or injury. In other words that the alleged dysfunction is real to the claimant.

▮ As the Commissioner has specifically included such element as a part of the test for a disabling somataform disorder, it cannot be seriously contended that this Court has added an additional element. Consequently, this issue is without

merit. *See Parks v. Sullivan,* 766 F.Supp. 627 (N.D.Ill.1991); *Parker v. Califano,* 441 F.Supp. 1174 (N.D.Cal., 1977); *Davis v. Califano,* 439 F.Supp. 94 (E.D.Pa.1977); *Bishop v. Weinberger,* 380 F.Supp. 293 (E.D.Va.1974). *Compare Brown v. Sullivan,* 921 F.2d 1233 (11th Cir.1991). *Compare Cass v. Shalala,* 8 F.3d 552 (7th Cir.1993).

3. *This Court is not empowered to order a sentence four remand for the award of benefits where the ALJ's error was misapplication of the pain standard.*

 This Court agrees that generally it should not order a sentence four remand for the award of benefits where the only reversible error is the ALJ's misapplication of the pain standard. However, the Eleventh Circuit has also ruled otherwise. *See Stewart v. Apfel,* 2000 WL 1862846 (11th Cir.2000) *aff'd,* 245 F.3d 793, 2000 WL 33125958 (11th Cir.2000)(Table), 2000 U.S.App. Lexis 33214; *Lewis v. Callahan,* 125 F.3d 1436 (11th Cir.1997); *Carnes v. Sullivan,* 936 F.2d 1215, 1219 (11th Cir. 1991); *Elam v. Railroad Retirement Board,* 921 F.2d 1210, 1217 (11th Cir.1991); *Walden v. Schweiker,* 672 F.2d 835, 840 (11th Cir.1982).

4. *The Claimant's history of alcohol abuse was irrelevant to her disabling condition.*

 This Court agrees that the statute (42 U.S.C. § 423(d)(2)(c)) prohibits the award of disability benefits to a claimant where alcohol abuse constitutes a contributing material factor of the disability. *Mitchell v. Commissioner of Social Security,* 182 F.3d 272 (4th Cir.1999), *cert. denied* 528 U.S. 944, 120 S.Ct. 358, 145 L.Ed.2d 280 (1999). Contrary to the Commissioner's allegations, the record is de-

void of any evidence from any treating or consultative physician or psychologist that the claimant's prior alcohol abuse constituted a contributing material factor to her disabling somataform disorder. At best, they simply co-existed at certain times. Therefore, this issue is without merit. *Compare Pena v. Chater,* 968 F.Supp. 930 (S.D.N.Y.1997), *aff'd* 141 F.3d 1152 (2nd Cir.1998).

5. *This Court properly concluded that the ALJ failed to give proper weight to the opinions of the claimant's treating physicians.*

As noted in the opinion, this Court concluded that the ALJ failed to give proper weight to the opinions of the claimant's treating physicians. The opinion clearly establishes such error; and the Commissioner's allegation to the contrary is not supported by any valid legal authority. Furthermore, it is clear that such failure adversely affected the outcome of the opinion, as the treating physicians, as well as the consultative psychologists, unequivocally show that the claimant is suffering from a disabling mental condition which entitles her to SSI disability benefits. Accordingly, Grounds 4 and 5 of the Commissioners Motion are without merit.

Notwithstanding the foregoing to the extent this Court erred in directing that the Commissioner award benefits commencing on a date certain, said opinion is in error. *See Bivines v. Bowen,* 833 F.2d 293 fn. 1 (11th Cir.1987). Therefore, said opinion is hereby modified so as to direct that, on remand, the Commissioner shall ascertain the amount of SSI benefits to which the claimant is entitled, and the date such payments should commence where the evidence shows that the claimant was disabled within the meaning of the Act by April, 1995.

IT IS THEREFORE ORDERED that, except as noted in the penultimate paragraph, the Commissioner's Motion for Reconsideration is DENIED.